# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN


## NO. 03-02-00232-CV


### Robert "Lee" Hammack, et al., Appellants

### v.

### Public Utility Commission of Texas, et al., Appellees[1]


### FROM THE DISTRICT COURT OF TRAVIS COUNTY,126TH JUDICIAL DISTRICT
### NO. GN101963, HONORABLE DARLENE BYRNE, JUDGE PRESIDING


## O P I N I O N


Robert "Lee" Hammack and others ("appellants") appeal from a district court judgment affirming an order of the Public Utility Commission of Texas (the "Commission") granting a certificate of convenience and necessity ("CCN") to Central Power and Light Company ("Central Power").[2] Before an electric utility may construct a transmission line, it must obtain a CCN from the Commission. *See* Tex. Util. Code Ann. § 37.056 (West 1998) (hereinafter "PURA"). The

---

[1] The appendix to this opinion lists the appellants and appellees individually.

[2] Effective December 23, 2002, the legal name of Central Power and Light Company has been changed to Centrica plc. We will refer to it as "Central Power" for purposes of this opinion.

Commission referred Central Power's application to the State Office of Administrative Hearings ("SOAH"). After conducting a contested-case hearing according to the Administrative Procedure Act ("APA"), the Administrative Law Judge ("ALJ") issued a proposal for decision ("PFD") recommending denial of Central Power's application. *See* Tex. Gov't Code Ann. §§ 2001.001-.902 (West 2000 & Supp. 2003). The Commission declined to adopt the proposal for decision in its entirety and approved Central Power's application for a CCN. The district court affirmed the Commission's order.[3]

Appellants appeal by fourteen points of error, complaining that: (1) the Commission applied a new standard in finding a need for the line, inconsistent with the statutory requirements; (2) the finding of need for the line was not supported by substantial evidence; (3) the finding that the new service will lower costs to customers and improve service is not supported by substantial evidence; and (4) the Commission improperly approved the route for the line. In addition, appellants complain of various procedural irregularities in adopting the order. We will affirm the judgment of the district court, affirming the order of the Commission.

## FACTUAL BACKGROUND

Many electric utilities in Texas have voluntarily interconnected their transmission systems, enhancing reliability and providing opportunities for utilities to purchase power from one

---

[3] The Commission issued its original order on November 30, 2000. Several appellants moved for rehearing, which the Commission granted in part. On April 25, 2001, the Commission issued its Second Order on Rehearing. Appellants again filed motions for rehearing on the Second Order, which the Commission denied. Therefore, the Second Order on Rehearing is the final order that is the subject of this appeal.

another. This interconnected network of transmission lines forms a single grid within the state, known as the Electric Reliability Council of Texas (ERCOT). Although two other regional power grids serve parts of the state, ERCOT serves most of the state.[4]

ERCOT is required to establish an Independent System Operator (ISO) charged with oversight of the transmission system in Texas. *See* PURA § 39.151 (West Supp. 2003). One of the statutory directives is to "ensure the reliability and adequacy of the regional electrical network." *Id.* § 39.151(a)(2). To accomplish this, ERCOT is given authority to enforce operating standards by establishment of policies, rules, guidelines, and procedures. *Id.* § 39.151(d), (h). To effectuate the legislative goal of adequate and reliable service, utilities are required to abide by the policies, rules, and procedures established by ERCOT. *Id.* § 39.151(j). The ISO's responsibilities include providing an annual report to the Commission identifying existing and potential transmission and distribution constraints, system needs, and recommendations for meeting those needs. *See id.* § 39.155(b) (West Supp. 2003).[5]

In 1996, Central Power expressed a concern regarding a shortage of power in the Rio Grande Valley. The line which is the subject of this case was proposed to ERCOT to increase the

---

[4] Because ERCOT is a wholly intrastate power grid, the federal scheme administered by the Federal Energy Regulatory Commission does not generally govern ERCOT.

[5] Section 39.155 of the utility code requires ERCOT to issue an annual report to the Commission "identifying existing and potential transmission and distribution constraints and system needs within ERCOT, alternatives for meeting system needs, and recommendations for meeting system needs." Tex. Util. Code Ann. § 39.155 (hereinafter "PURA") (West Supp. 2003).

capacity of transmission into the Rio Grande Valley to meet a future-projected load. On October 1, 1999, pursuant to the requirements of PURA section 39.155, the ISO sent a report to the Commission identifying, among other concerns, a constraint on the transfer capacity of power into South Texas as well as a constraint on transfer capacity from South to North.

On November 30, 1999, Central Power filed its application for a CCN to construct a 53-mile-long, high-voltage transmission line from Central Power's Coleto Creek Power Plant in Goliad County to the Pawnee Substation in Karnes County. The Commission referred the case to SOAH to conduct a contested-case hearing. Numerous landowners, some of whom were plaintiffs below, intervened in the agency proceeding. In August 2000, the ALJ issued a PFD recommending denial of the application. The ALJ found, among other things, that there was insufficient evidence demonstrating a public need for the proposed line. However, the PFD supported the route proposed by Central Power.

The Commission reviewed the evidence and in its final order found there was a public need for the line, that existing service was inadequate, and that granting the CCN would result in a probable improvement of service or lower costs to consumers. Appellants sought judicial review in district court, which affirmed the Commission's order in March 2002. Appellants appeal from the judgment.

## DISCUSSION

*Statutory Requirements of Necessity*

Before addressing appellants' points of error, it is necessary first to set out the statutory provisions that govern the Commission's issuance of certificates of convenience and

4

necessity. Under section 37.051 of PURA, a public utility is forbidden to render service to the public, directly or indirectly, "unless the utility first obtains from the commission a certificate that states that the public convenience and necessity requires or will require the installation, operation, or extension of the service." *Id.* § 37.051 (West Supp. 2003). The Commission can grant a CCN pursuant to PURA section 37.056 as follows:

Section 37.056. Grant or Denial of Certificate

(a) The commission may approve an application and grant a certificate only if the commission finds that the certificate is necessary for the service, accommodation, convenience, or safety of the public.

(b) The commission may:

(1) grant the certificate as requested;

(2) grant the certificate for the construction of a portion of the requested system, facility, or extension or the partial exercise of the requested right or privilege; or

(3) refuse to grant the certificate.

(c) The commission shall grant each certificate on a nondiscriminatory basis after considering:

(1) the adequacy of existing service;

(2) the need for additional service;

(3) the effect of granting the certificate on the recipient of the certificate and any electric utility serving the proximate area; and

(4) other factors, such as:

(A) community values;

5

(B) recreational and park areas;

(C) historical and aesthetic values;

(D) environmental integrity; and

(E) the probable improvement of service or lowering costs to consumers in the area if the certificate is granted.

*Id.* § 37.056 (West 1998). The Commission's Substantive Rule section 25.101(c) provides:

(c) Certificates of convenience and necessity for new service areas and facilities. Except for certificates granted under subsection (b) of this section, the commission may grant an application and issue a certificate only if it finds that the certificate is necessary for the service, accommodation, convenience, or safety of the public. For transmission line certificate applications the commission shall give great weight to the recommendation of the Electric Reliability Council of Texas (ERCOT) Independent System Operator (ISO) in determining the need for a proposed transmission line.

16 Tex. Admin. Code § 25.101(c) (2003).

***"Necessity"***

In points of error one and four, appellants contend the Commission applied a new legal standard of public need inconsistent with the plain meaning of PURA section 37.056(a) and in excess of the Commission's statutory authority, resulting in due-process violations. Appellants point to the language in the Commission's order where, in disagreeing with the PFD, the agency states that "a broader view should be taken when evaluating the issue of need." In doing so, appellants argue, the Commission applied a new legal standard to the determination of public

6

necessity, under PURA section 37.056, that is inconsistent with the statutory language. Specifically, appellants argue that the Commission justified approving the application based on a global assertion of the "needs of the interconnected statewide transmission systems," which is broader than those stated in the statute. Appellants claim that the Commission can only consider the "adequacy of existing service" and "the effect of granting the certificate on the recipient of the certificate and any electric utility serving in the proximate area." PURA § 37.056(c)(3).

The standard applicable to the CCN proceeding, set forth in PURA section 37.056, states that in approving a CCN the Commission must find that it is necessary for the "service, accommodation, convenience, or safety of the public." *Id.* § 37.056(a). Further, section 37.056(c) sets out factors for the Commission to consider in granting a certificate, such as the adequacy of existing service, the need for additional service, the effect on both the recipient of the certificate and any other utilities serving the area, and other factors, such as community values, recreational and park areas, historical and aesthetic values, environmental integrity, and the probable improvement of service or lowering of cost to consumers in the area. *Id.* § 37.056(c)(1)-(4).

In this case, the Commission concluded that the "proposed line is necessary for the service, accommodation, convenience, or safety of the public." In support of its conclusion, the Commission made numerous findings of fact. Some of the more critical of these findings are:

> l9. An October 1, 1999 "Report on Existing and Potential Electric System Constraints and Needs in ERCOT," filed with the Commission by the ERCOT ISO, identified existing and potential transmission constraints and system needs throughout the ERCOT system and included [Central Power's] proposed project in its list of recommended projects to address these constraints.

7

20. One such constraint identified by the ISO was a constraint on the transfer capacity of power to the Corpus Christi area and points south.

21. This constraint was first identified by the ISO in October 1998, and on December 15, 1998, the ERCOT Board of Director[s] adopted the ISO's recommendation that the proposed transmission line be constructed.

22. The ISO recognized, in its 1999 report, that the import constraint had been substantially addressed since four new cogeneration units came on line in South Texas during the summer of 1999. The report states:

*Constraint to the Rio Grande Valley*

All transmission lines in the area have remained in service during the summer [of 1999] (except for a short time during hurricane Bret). Since two Frontera generating units (total 300 MW) came on line in the Valley during the summer, the number of schedule curtailments and generation realignments have been all but eliminated compared with the summer of 1998. With availability of redispatch from new generation for unplanned transactions, the Valley system operation has been able to meet ERCOT transmission security (first contingency) criteria.

23. Power generation has for the past decade been insufficient in South Texas, particularly in Corpus Christi, Laredo, and the lower Rio Grande Valley, requiring [Central Power] to import power in amounts up to 900 megawatts (MW) during peak load conditions and, at times, to interrupt service to its customers in that region.

24. As of the time of the hearing in this proceeding, five new power generation plants were under construction in South Texas.

25. New construction of power generation plants in South Texas is expected to increase available power in that region by approximately 2,700 MW in the near future and approximately 4,000 MW in the long run.

26. [Central Power] provided substantial evidence that there is currently a constraint on the export of power from South Texas to other parts of Texas, that the existing transmission system is inadequate to support the export of the excess power, and that the proposed project will relieve the constraint.

26A. Increasing transmission capacity to and from the Corpus Christi area and South Texas will permit additional power imports to and exports from these areas. Without increasing this capacity through such steps as the construction of the Coleto Creek-Pawnee transmission line, new, highly efficient generators will be constrained from making sales into the ERCOT market. Increasing transmission capacity will allow for the economic and competitive exchange of electric power among all systems and industry participants and such transfers help to reduce the cost of electric supply to customers and provide a more liquid market.

27. [Central Power] provided affirmative evidence to establish that the existing service is inadequate and that there is a need for additional transmission service.

The Commission based its findings on both the ISO October 1999 report and the testimony of Paul Hassink, Manager for ERCOT/Mexico Region Transmission Planning for Central and South West Services. The ISO's report identified transmission constraints from South Texas to North Texas, into the Rio Grande Valley, and in the Corpus Christi area. The report states that:

Due to its very nature, transmission planning is a continuous process. Therefore, conclusions reached in this report are a snapshot in time that can change with the addition (or elimination) of plans for new generation, transmission facilities, equipment, or loads.

. . . .

The new transmission projects discussed in the report are intended to ensure conformance to ERCOT Planning Criteria and North American Electric Reliability Council (NERC) system reliability standards.

. . . .

The first purpose of this report is to document the process of changes and additions to the ERCOT transmission grid. This helps to ensure continuity in the development of the transmissions grid, consistency in the evaluation of grid adequacy, and documents the need for new facilities.

9

Commission substantive rule section 25.101 says that the Commission shall "give great weight to the recommendation" of the ISO in determining the need for a proposed transmission line, reflecting the agency's recognition of the expertise possessed by the ISO in the area of electrical transmission and distribution. *See* 16 Tex. Admin. Code § 25.101(c).

Moreover, Hassink explained that since ERCOT's initial report in 1998, the construction of a substantial amount of new generation began in the Corpus Christi and Lower Rio Grande Valley areas. However, this new generation would result in potential export constraints and would not eliminate import constraints during peak usage. Hassink testified that of the 2,700 MW of new generation under construction, 1,000 MW could be used to serve Central Power's customers in the Rio Grande Valley and only 1,000 MW could be exported out of the Rio Grande Valley. Therefore, without Central Power's proposed project, 700 MW of generation from new, highly efficient generators will be constrained to the Rio Grande Valley and any additional generation in the area will serve to exacerbate the export transmission constraint. In addition, Hassink testified that Central Power is still in a situation where it must import electricity to serve its customers during the summer when its load is at its peak.

Appellants take from its context the Commission's statement that "a broader view should be taken when evaluating the issue of need." In its final order, the Commission explained that the ALJ's focus had been too narrow in finding that Central Power failed to meet its burden to prove public need, concluding that a broader view should be taken in that regard. The Commission explained that the constraints identified in the ERCOT report, which was only part of the evidence offered by Central Power to meet its burden of proof on public need but on which the ALJ based her

10

ruling, were much broader than simply the need for imported power to South Texas.[6] In disagreeing

with the ALJ, the Commission stated:

> When considering whether a project is necessary for the service, accommodation, convenience, or safety for the public, the focus should not be limited to the needs of an isolated geographic area, but instead should consider the needs of the interconnected statewide transmission systems. The Commission gives more weight to the broader, overall policy goals of encouraging the development of interconnected transmission systems to allow new generation to be fully integrated into the grid, to provide for additional competition in the wholesale market, and to promote lower energy prices.

The legislature has expressly charged the Commission to determine whether a certificate for a transmission line should be issued. PURA §§ 37.051, .053, .056 (West 1998 & Supp. 2003). The legislature has also set forth the standards the Commission must consider in making that determination. *Id.* § 37.056. These factors are stated in the broadest possible terms and are intended as legislative standards to guide the Commission in its administration of the certification process. *Public Util. Comm'n v. Texland Elec. Co.*, 701 S.W.2d 261, 266 (Tex. App.—Austin 1985, writ ref'd n.r.e.). As this Court stated in *Texland*,

> To implement in particular circumstances such broadly stated legislative objectives and standards, the Commission must necessarily decide what they mean in those circumstances and because some of them obviously compete *inter se*, the agency may in some cases be required to adjust or accommodate the competing policies and

---

[6] The ALJ concluded that Central Power had failed to meet its burden to demonstrate a public necessity for the proposed line based on the fact that the 1999 ERCOT report stated that the constraint on the *import* of power to the Corpus Christi area and points south, which were first identified in October 1998, were substantially addressed since four new cogeneration units came on line in South Texas during the summer of 1999. The ALJ reasoned that the original justification for the proposed line identified by the ISO has been addressed.

11

interests involved. For example, a "need" for additional service implies a relative requirement, ranging from an imperative need to one that is minimal; and, if a "need" be sufficiently grave, it may have to prevail notwithstanding an adverse affect upon another interest, such as the environment. Conversely, "environmental integrity" may in some circumstances have to prevail over a need for the additional service. None of the statutory factors is intended to be absolute in the sense that any one shall prevail in all possible circumstances. In making these sometimes-delicate accommodations, the agency is required to exercise its "expertise" to further the *overall* public interest.

*Id.* The Commission may find it necessary to specify and employ more particular factors in order to effectuate the general factors expressed in section 37.056. *Id.* at 267. This is a matter that is within the Commission's discretion. *Id.*

In addition, the Commission's interpretation of need must be viewed in light of the legislative directive that the Commission formulate policies responsive to the needs of the emerging competitive wholesale market. In PURA section 31.001, the legislature concluded:

The wholesale electric industry, through federal legislative, judicial, and administrative actions, is becoming a more competitive industry that does not lend itself to traditional electric utility regulatory rules, policies, and principles. As a result, the public interest requires that rules, policies, and principles be formulated and applied to protect the public interest in a more competitive marketplace. The development of a competitive wholesale electric market that allows for increased participation by electric utilities and nonutilities is in the public interest.

PURA § 31.001 (West 1998). The Commission's evaluation of public need from the standpoint of a statewide wholesale delivery of electricity is responsive to this legislative policy; and, it is well within the Commission's authority to decide what the statutory standard of "need" means in any specific situation.

12

As a general rule, administrative agencies possess by implication such powers as may be necessary to effectuate the legislative objectives which underlie the administrative powers expressly conferred upon them. *Texland Elec.*, 701 S.W.2d at 269. Because administrative agencies are given their statutory powers with a view to achieving legislative purposes more fully and effectively through the agency's specialized judgment, knowledge, and experience, the methods chosen by the agency, and its interpretation of the statute it is required to administer, are entitled to judicial respect. *Id.* Moreover, the Commission has been given more control than some other agencies over the ultimate disposition of its cases. *See* PURA § 14.051 (West 1998);[7] *Southwestern Pub. Serv. Co. v. Public Util. Comm'n*, 962 S.W.2d 207, 214 (Tex. App.—Austin 1998, pet. denied). This especially makes sense in the public-utility arena. Public-utility matters are frequently complex, often involving objective evidence more conducive to review on a written record than evidence such as live-witness testimony and its attendant credibility concerns. *Southwestern Pub. Serv.*, 962. S.W.2d at 214.

In this case, the Commission reasonably interpreted and applied the public-need standard by including a consideration of customers and market participants throughout the state as opposed to only one isolated part of the state. Moreover, in considering public need in light of an expected impact of the line in the area in which it is to be constructed, the Commission found, based on Hassink's testimony, that inadequacies in service in the area near the line in South Texas created a need for the line, concluding:

---

[7] Section 14.051 of PURA allows the Commission to conduct its own hearings and make findings of fact. PURA § 14.051(1), (5) (West 1998).

[M]r. Hassink's testimony supports a finding that the transmission constraint originally identified by the ISO still exists, and that the constraint now presents a problem both for importing electricity into and exporting electricity out of the South Texas area.

The determination of public need is made at the time of the hearing. The ERCOT report is but one part of the evidence the commission relied on in making this determination. Additionally, the Commission is not constrained by the public need identified in the application for a CCN. The facets of public need may very well be fluid. Addressing one need may create another, as is evidenced in this case. For example, at the time the ERCOT report was generated in 1999, several new cogeneration units were under construction to meet the constraint on the import of power to South Texas. However, with the new cogeneration units came a corresponding constraint relating to the export of power from South Texas. In addition, there was still an identifiable constraint on the import of power during the summer months when usage is at its peak. These constraints are specifically addressed in the Commissions findings 26 and 26A, set forth above.

We cannot conclude that the Commission has applied an inappropriate or new legal standard in its determination of a public need for the proposed line. It is the Commission's role to apply the statutory standards in a given case. This Court has addressed the Commission's flexibility in applying the statutory criteria established in PURA section 37.056. *See Texland Elec.*, 701 S.W.2d at 266. We hold the Commission did not improperly apply section 37.056 in light of the entire statutory scheme and overrule points of error one and four.[8]

---

[8] As part of their argument, appellants complain that, the Commission, by approving Central Power's application on the broad grounds stated by the Commission, renders useless the alternative standards added in PURA section 39.203. We find this argument without merit. Section 39.203

14

***The Substantial Evidence Rule***

In points of error two and three, appellants complain that there is not substantial evidence to support the granting of the CCN. We review Commission orders under the substantial evidence rule. *See* PURA § 15.001 (West 1998); Tex. Gov't Code Ann. § 2001.174 (West 2000). Under the substantial evidence rule, we presume that the Commission's order is supported by substantial evidence and appellants have the burden to overcome this presumption. *See Sportscoach Corp. of Am. v. Eastex Camper Sales, Inc.*, 31 S.W.3d 730, 733 (Tex. App.—Austin 2000, no pet.); *Meier Infiniti Co. v. Motor Vehicle Bd.*, 918 S.W.2d 95, 98 (Tex. App.—Austin 1996, writ denied).

The APA's "substantial evidence" test provides that a court reviewing an agency action shall reverse and remand the cause to the agency when substantial rights of the appellant have been prejudiced by an agency's findings that are not reasonably supported by substantial evidence considering the reliable evidence in the record as a whole. Tex. Gov't Code Ann. § 2001.174(2)(E). This means we may not substitute our judgment for that of the agency on the weight of the evidence; we must, however, test any disputed finding of basic or underlying fact against that body of evidence. *Lauderdale v. Texas Dept. of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ). The crux of a substantial evidence analysis is whether the agency's factual findings are reasonable "in light of the evidence from which they were purportedly inferred." John E. Powers, *Agency Adjudications* 163 (1990). "Substantial evidence" is thus a term of art. It "does not mean a large

---

addresses a situation where the Commission requires a utility to construct transmission facilities to "ensure safe and reliable service for the state's electric markets." PURA § 39.203 (West Supp. 2003). The Commission determined in this case that section 39.203(e) was limited in application to transmission projects deemed "critical" by ERCOT and this transmission project was not deemed "critical."

or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" of fact. *Lauderdale*, 923 S.W.2d at 836 (quoting *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988)). Therefore, we will sustain an agency's finding if reasonable minds could have reached the same conclusion. *Texas State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988).

Appellants first argue in point of error two that the Commission's finding of a public need for the line is not supported by substantial evidence. As discussed above, in reaching its determination that the proposed transmission line was needed, the Commission relied on the 1999 ISO report and the testimony of Hassink. Appellants challenge the Commission's reliance on this evidence for various reasons; however, none of appellants' challenges discredit the ERCOT report or Hassink's testimony as evidence from which the Commission could reasonably infer a public need for the proposed line.

Appellants assert that because of the construction of four new generation facilities in South Texas, the need to import power to South Texas was eliminated. However, the evidence before the Commission was that these new generation facilities created another constraint—a constraint on the export of power from these new facilities in South Texas to other parts of Texas. Further, Hassink testified that the need for the proposed line to import electricity in the summer months when load is at a peak continues to exist.

Appellants' arguments do not overcome their substantial burden. The Commission's decision need only be supported by substantial evidence, *i.e.*, "whether some reasonable basis exists in the record" for the agency determination. *State v. Public Util. Comm'n*, 883 S.W.2d 190, 204

16

(Tex. 1994).  The ISO report and the testimony of Hassink clearly provide a reasonable basis in the record for the Commission's determination of need.  Point of error two is overruled.

In their third point of error, appellants contend that the requirement that a utility demonstrate that a proposed transmission line lowers cost and improves service for customers was not supported by substantial evidence. PURA section 37.056(c) requires the Commission to consider whether the proposed line will result in "the probable improvement of service or lowering of cost to consumers."  PURA § 37.056(c)(4)(E).  The Commission included in its order a finding that specifically addresses this factor—finding of fact 26A, set forth above.  Moreover, findings of fact 23-26, set forth above, are additional factual findings that support the Commission's ultimate finding that Central Power's application adequately addresses the statutory factor of probable improvement of service or lowering of costs to consumers.

Hassink's testimony supports the Commission's finding of a transmission constraint preventing the export of power from South Texas to other markets.  He testified that Central Power's analysis shows that the Coleto Creek line is needed to support an increased level of power exports from South Texas and Central Power's system is insufficient to handle the required power transfer. He then explained how a lack of sufficient transmission capacity prevents movement of power.  In addition, Hassink's testimony affirms a continuing need for the line to facilitate import of power to South Texas and the Commission could reasonably conclude as it did.

In its order, the Commission noted that increasing transmission capacity to and from the Corpus Christi area and South Texas will permit additional power imports to and exports from these areas.  Without increasing this capacity through such steps as the construction of the Coleto

17

Creek-Pawnee transmission line, new, highly efficient generators will be constrained from making sales into the ERCOT market. Therefore, the Commission concluded that there was a sufficient showing of probable improvement of service or lowering of costs to consumers. We hold there is a reasonable basis in the record to support the Commission's finding that the proposed line will result in the probable improvement of service or lowering of cost to consumers. Point of error three is overruled.

*Route Challenges*

In points of error five through seven, appellants complain that the Commission's order regarding the route of the line did not properly consider the statutory criteria and is not supported by substantial evidence. We disagree. In determining the route, the Commission had before it a variety of evidence, including a routing study provided by a consulting firm hired by Central Power, and the testimony of several witnesses.

To determine the best route for the line, Central Power employed Burns and McDonnell to provide an independent routing study and assess the environmental impacts of the proposed line. Burns and McDonnell studied 28 different routes, eventually recommending the route proposed in Central Power's application as the preferred route. They also evaluated many of the statutory factors in PURA section 37.056, such as community values, historical and aesthetic values, parks and recreation areas, and environmental impacts.

With respect to community values, the study showed (1) no significant impact on land use in the area of the preferred route, (2) no residences or habitable structures within 200 feet of the centerline, (3) no commercial or municipal properties within 200 feet of the centerline, (4) no

18

schools, churches, nursing homes, hospitals, or known cemeteries within 200 feet of the centerline, (5) no pastures or croplands irrigated by traveling irrigation systems that will be traversed by the line, (6) no AM or FM radio transmitters within 10,000 feet of the centerline, but two microwave-relay stations within 2000 feet and one microwave tower within 300 feet of the centerline, none of which will be adversely affected by the line, (7) one unregistered private-use airstrip within 10,000 feet of the centerline, and (8) no parks within 1,000 feet of the centerline and one recreation area, situated at the Coleto Creek Power Plant and owned by Central Power, that is crossed by the line.

Burns and McDonnell further concluded that there would probably be no impact on historical or archeological resources in the area and minimal visual impacts on the area. Further, they found that the environmental impacts would be minor or limited and temporary due primarily to construction activities, based on an analysis of the terrain and soils, hydrology, vegetation, and wildlife in the area. As a result of this study, the preferred route was requested by Central Power in its application.

Appellants first complain that the Commission erred by failing to require Central Power to route the transmission line so that it followed existing rights of way. In considering an application for a certificate of convenience and necessity, section 37.056(c) requires the Commission to consider such factors as "community values, recreational and park areas, historical and aesthetic values, environmental integrity, and the probable improvement of service or lowering of cost to consumers . . . ." *Id.* § 37.056(c)(4)(A)-(E). It is the applicant's burden to produce evidence relative to such factors, and the Commission's duty to file findings with respect to such factors. There is

19

nothing in section 37.056(c) that requires the Commission to consider utilization of existing rights of way.

In determining whether to grant a CCN for a transmission line, the Commission is required only to consider, in the context of the case at hand, the statutory factors. *See id.* § 37.056. These factors give the Commission "stated objectives toward which to work" in authorizing CCNs. *Texland Elec.*, 701 S.W.2d at 266. This Court has recognized that some of the factors may compete, so that the Commission may, in some cases, be required to "adjust or accommodate the competing policies and interests involved." *Id.* Thus, to implement these broad factors in any particular case, the Commission "must necessarily decide what they mean in those circumstances." *Id.* We hold the Commission was not statutorily required to consider use of existing rights of way in evaluating Central Power's proposed route.[9] Point of error five is overruled.

Next, appellants complain that the Commission's order is not supported by substantial evidence because Central Power did not officially propose additional routes. Appellants concede that a utility is not required to propose alternative routes but argues that no reasonable person could conclude that Central Power's only proposed route meets the statutory standards without consideration of an alternative route that follows the existing right of way. In support of their contention, appellants cite two cases, *Goeke v. Houston Lighting & Power Co.*, 797 S.W.2d 12 (Tex.

---

[9] Although it was not statutorily required to do so, the Commission did consider routes paralleling existing rights of way and rejected them. The Commission adopted the ALJ's proposal for decision discussing the routes paralleling existing rights of way and concluding that the routes exiting the north side of the Coleto Creek Power Plant were properly discounted. The northern routes contained a greater number of wetlands, stream crossings, vegetation clearing, and residences within 200 feet of the proposed centerline.

1990) and *Sam Houston Electric Cooperative v. Public Utility Commission*, 733 S.W.2d 905 (Tex. App.—Austin 1987, writ denied). However, neither *Goeke* nor *Sam Houston Electric* implies that the Commission must consider alternative routes for its order to be supported by substantial evidence. In fact, both cases expressly recite the principle that "PURA section 54(c)[10] does not specifically require the applicant to present evidence that it studied alternative solutions to its problem or alternative routes for the location of transmission lines." *Sam Houston Elec.*, 733 S.W.2d at 910; *accord Goeke*, 797 S.W.2d at 15 n.3 ("This does not mean that HL&P was required to show that it considered alternative routes."). Further, in *Frost v. Public Utility Commission*, we held that there is nothing in the statute that requires the applicant to present evidence on alternative routes, and therefore, the Commission has no duty to find facts in that regard. 672 S.W.2d 883, 885 (Tex. App.—Austin 1984, writ ref'd n.r.e.). In any event, there is substantial evidence in this case that Central Power, with its consultants, studied numerous alternative routes. Point of error six is overruled.

Finally, appellants complain that the Commission's decision to approve the proposed route is not supported by substantial evidence because the route studied is not the route approved. The record shows that Burns and McDonnell studied the entire area of the proposed line for environmental and socioeconomic impacts. The overall review of the environmental and socioeconomic factors for the area of the route is sufficient to support the Commission's four minor changes to the route. These changes were made to address specific concerns expressed by the individual landowners whose property was affected. Further, the changes Central Power

---

[10] Now codified as PURA § 37.056(c) (West 1998).

21

recommended were intentionally limited to the specific landowners' property. Therefore, the impact of the change would only be on the property that had already been studied. Given the scope of Burns and McDonnell's analysis, the Commission reasonably could conclude that the minor route changes were not significant enough to have been outside the scope of the environmental assessment. Additionally, there was testimony that these types of minor changes to accommodate landowners occur frequently in CCN proceedings. Due to the fluid nature of these proceedings, it is necessary to make accommodations as the proceedings progress. Accordingly, point of error seven is overruled.

*Procedural Irregularities*

In points of error eight through thirteen, appellants complain of numerous procedural irregularities. The majority of the procedural irregularities are allegations that the *ex parte* communication prohibition of the APA was violated. *See* Tex. Gov't Code Ann. § 2001.061 (West 2000). Appellants also claim that the Open Meetings Act was violated because the Commission made changes to the findings and conclusions in the ALJ's PFD, which were not discussed in any of the open meetings held by the Commission. *See id.* §§ 551.001-.146 (West 1994 & Supp. 2003). Finally, appellants argue that the trial court erred by sustaining the Commission's claim of privilege regarding certain documents. The trial court found that none of these claims required reversal of the Commission's final order, and filed findings and conclusions that laid out the reasons appellants' procedural irregularity claims failed. Appellants challenge several of these findings.

Appellants complain of the following communications:

(1) Assignment of an individual who represented a party as advisory staff to the decision-makers;

(2) Letters and e-mails received by the Commissioners from Sam Jones of ERCOT;

(3) Amicus Curiae filings received by the Commissioners from Reliant Energy, Inc., Calpine Corporation, and Public Utilities Board of Brownsville;

(4) Communications between Central Power and the Commission prior to the time Central Power filed its application for a CCN; and

(5) The fact that Pat Wood, who was the Chairman of the Commission during this docket, was also a member of the ERCOT board.

Section 2001.061 of the government code provides:

Unless required for the disposition of an ex parte matter authorized by law, a member or employee of a state agency assigned to render a decision or to make findings of fact and conclusions of law in a contested case may not directly or indirectly communicate in connection with an issue of fact or law with a state agency, person, party, or a representative of those entities, except on notice and opportunity for each party to participate.

*Id.* § 2001.061(a).

Notwithstanding the trial court's filing of findings of fact and conclusions of law, the fact remains that *appellants* bore the burden of proof to establish by evidence the procedural irregularities they allege. And because they bore the burden of proof, they must show on appeal that upon consideration of all the evidence, the trial court's *failure to find* such irregularities is against the great weight and preponderance of the evidence. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). We may reverse the trial court's failure to find in appellants' favor only if, in our judgment,

23

the great weight and preponderance of the evidence supports an affirmative determination that such irregularities *did* occur. *See Ames v. Ames*, 776 S.W.2d 154, 159 (Tex. 1989).

Even if the findings of fact and conclusions of law filed by the trial judge are set aside, that will not *establish* the findings appellants had to obtain to establish their claims of procedural irregularities. In the interests of justice, however, we will as best we can consider appellants' contentions as challenges to the trial court's failure to find facts that would establish the alleged procedural irregularities.

Appellants first complain that the trial court erred in finding that Commission attorney Tom Best did not "participate" in the contested case hearing as contemplated by the *ex parte* prohibition. Best, an attorney with the Commission's Office of Regulatory Affairs during the time this case was pending before SOAH, filled in for the attorney assigned to this case during the last hour and forty-five minutes of the hearing. Appellants claim that his appearance rendered Best an agency employee who participated in the contested case proceeding and thus the Commissioners were not authorized to communicate *ex parte* with him in his subsequent role as a member of the Commission Office of Policy Development. Section 2001.061(c) authorizes agency decision makers to seek advice through *ex parte* communications only with an agency employee "who has not participated" in the contested case hearing "for the purpose of using the special skills or knowledge of the agency and its staff in evaluating evidence." Tex. Gov't Code Ann. § 2001.061(c).

The record shows that the Commission was represented in this case by Karen Hattaway; however, during the last hour and forty-five minutes of the last day of a five-day hearing, Best filled in for Hattaway. The transcript from that time period shows that Best introduced no

24

exhibits, put on no direct or rebuttal witnesses, did not cross-examine any witnesses, and did not present any argument on behalf of the Commission. Nor did Best sign any motions or pleadings on behalf of the Commission. Based on the foregoing, the trial court found that Best did not participate in proceeding, and, alternatively, there was no harm.

Appellant's argument presupposes that by establishing Best's participation, they have shown reversible error. Appellant's burden of proof at trial, however, was to establish not only that an *ex parte* communication occurred but also that the communication fell within the prohibition, namely, the introduction of "litigious facts before the agency decision makers without becoming part of the record in the contested case." *Young Chevrolet, Inc. v. Tex. Motor Vehicle Bd.*, 974 S.W.2d 906, 914 (Tex. App.—Austin 1998, pet. denied). Furthermore, appellants had to show that if error occurred—that Best participated, that Best communicated, and that the agency and Best discussed "litigious facts"—they were harmed by that error. *See Vandygriff v. First Sav. & Loan, Etc.*, 617 S.W.2d 669, 673 (Tex. 1981) (requiring the party alleging an improper *ex parte* communication to establish not only the error but to show harm); *see also* Tex. Gov't Code Ann. § 2001.174 (prohibiting a court from reversing an agency decision unless the "substantial rights of the appellant have been prejudiced"). The mere showing of "participation" is insufficient to warrant reversal. Appellants fail to draw our attention to a specific communication which would have fallen within the prohibition, and, if so, how the introduction of litigious facts before the decision makers harmed them. Points of error eight and nine are overruled.

Appellants next complain of e-mails and an amicus letter sent by Sam Jones, Director of the ISO, to the Commissioners, as well as amicus filings by Reliant Energy, the Public Utilities

25

Board of Brownsville, and Calpine Corporation. The prohibition against *ex parte* communications is designed to prevent the injection of new facts in the proceeding while denying a party the opportunity to rebut those facts. *See id.* at 914. The mere fact that an *ex parte* communication occurred is not sufficient to establish a violation of due process. *Id.* Section 2001.061 of the government code sets out an exception to the general prohibition on *ex parte* communications. *See* Tex. Gov't Code Ann. § 2001.061(a). When each party is on notice and has an opportunity to participate, the communication does not violate section 2001.061. *Young*, 974 S.W.2d at 912.

The trial court found, and the evidence supports, that appellants had notice of these *ex parte* communications and an opportunity to address them. The e-mails from Sam Jones were placed in the agency record and a letter was sent to all parties in the case informing them of the existence of the e-mails. The letter from Sam Jones was served on all parties. The filings by Reliant, Public Utilities Board, and Calpine were also made part of the administrative record in this case. Significantly, appellants did not request the opportunity to re-open the evidence to respond to the communications. We cannot say that the findings made by the trial court that appellants had notice and an opportunity to be heard with regard to these communications is so against the great weight of the evidence as to be clearly wrong. Point of error ten is overruled.

Appellants further complain that communications between the Commission and Central Power before Central Power filed its application for the CCN constitute impermissible *ex parte* communications. This argument is without merit. Communications that do not take place during the contested case proceeding are not *ex parte* communications. *Vandygriff v. First Sav. & Loan Assoc.*, 617 S.W.2d 669, 672 (Tex. 1981). In *Vandygriff*, the supreme court held that the APA

26

only "prohibits *ex parte* communications during pendency of a contested case." *Id.* at 671. "There is no contested case until an application . . . is filed." *Id.* We overrule appellants' eleventh point of error.

In their twelfth point of error, appellants argue that the Commission failed to follow the requirements of the Open Meetings Act in adopting the order in this case. Specifically, appellants complain that the final order signed by the Commissioners changed several findings of fact and conclusions of law from the ALJ's PFD. Appellants claim that a Commission vote is required to change a finding of fact or conclusion of law from a PFD. However, appellants cite no authority to support this claim and we are unaware of any such authority. In any event, section 2003.049 of the government code allows the Commission to reevaluate the evidence admitted at a SOAH hearing to determine whether the ALJ's findings are supported by a preponderance of the evidence. Tex. Gov't Code Ann. § 2003.049(g) (West 2000). All that is required of the Commission is that it state in writing the specific reason and legal basis for any changes. *Id.* § 2003.049(h).

Even if a Commission vote was required to change a finding of fact of the ALJ, appellants have failed to preserve error. In order to appeal an administrative agency's decision, a motion for rehearing is required. *See id.* § 2001.145 (West 2000). The complainant must succinctly set forth the legal or factual basis of the error sufficient to provide the agency notice of the alleged error so that it can either correct it or defend it. *See Brown v. Texas Dep't of Ins.*, 34 S.W.3d 683, 687 (Tex. App.—Austin 2000, no pet.). Appellants failed to raise this issue in a motion for rehearing. Appellants claim procedural irregularities such as an Open Meetings Act violation are not required to be included in a motion for rehearing to preserve the error, relying on *State Banking*

27

*Board v. First State Bank of Gainesville*, 618 S.W.2d 905 (Tex. App.—Austin 1981, no writ). However, that case stands for the proposition that claims of procedural irregularity *not known to a party* at the time of filing motions for rehearing need not be included. *See id.* at 909.

Moreover, appellants provided no evidence that the Commissioners failed to vote on these changes. The only evidence appellants provided in the trial court was the transcript from the September 20, 2000, meeting where the Commissioners deliberated on the ALJ's PFD for the first time. There were several additional open meetings held in this docket but appellants did not include in evidence the transcripts from these open meetings or provide any other proof demonstrating that the Commission failed to consider and vote on these matters. Accordingly, the trial court found that appellants failed to prove that there were never any deliberations on the changes to the ALJ's findings and conclusions. For all of the above reasons, point of error twelve is overruled.

In their thirteenth point of error, appellants complain that the Commission chairman's dual role as a decision-maker in this case and as an ERCOT board member violates the common-law doctrine of incompatibility. The chairman of the Commission is, *by statute*, an ex officio (non-voting) member of the Board of Directors of ERCOT. *See* PURA § 39.151(g) (West Supp. 2003). It is unclear how appellants claim to have been prejudiced by this dual relationship other than their claim that it had to lead to impermissible *ex parte* communications regarding the need for the line that the Commission approved.

The trial court found no evidentiary support for appellants' claim of incompatibility and *ex parte* communications. In his affidavit introduced in evidence before the trial court, Chairman Wood swore that during his time of service on the ERCOT board, "specific discussions

28

about this transmission line did not occur in my presence during the pendency of Docket No. 21741."

He stated that his practice was to excuse himself from the meeting whenever pending dockets before the Commission came up for discussion. The presumption is that the Commissioner performed his duties in compliance with the law, and it is the appellants' burden to show that he did not. *Vandygriff*, 617 S.W.2d at 672-73. The trial court found that appellants made no evidentiary showing to support their claims of incompatibility and *ex parte* communications and we have found nothing in the record to the contrary.

Appellants further argue that the Commission has improperly delegated its power and duties to ERCOT. As discussed in detail above, the Commission made its public-need determination based on the entire evidentiary record before it, including the ISO report recommending in favor of the proposed transmission line. However, it was the Commission, not ERCOT, that made the ultimate determination that there was a public need for the proposed transmission line based on the record from a lengthy contested case proceeding. The trial court found that appellants failed to present evidence sufficient to overcome the presumption that the Commission's final order is based on a valid exercise of its power and discretion. We agree. Therefore, we overrule point of error thirteen.

In appellants' fourteenth and final point of error, they claim that the trial court erred by sustaining the Commission's assertions of privilege as to certain documents. Specifically, appellants served various discovery requests on the Commission and Central Power which they believed were related to the procedural errors complained of above. The documents at issue are certain e-mails as well as the Commissioners' briefing materials. The trial court found the e-mails

29

were subject to both the attorney-client and work-product privileges and the briefing materials were privileged under the attorney-client, work-product, and deliberative-process privileges.

Appellants argue that the trial court erred by sustaining the Commission's claims of privilege based on the attorney-client and deliberative-process privileges. The trial court, however, based its rulings as to both sets of documents on the work-product privilege, in addition to other privileges. Appellants do not advance an argument that the trial court erred in withholding the documents on the basis of the work-product privilege. Because the trial court's ruling stands unchallenged based on the work-product privilege, point of error fourteen is overruled.

**CONCLUSION**

Having overruled all of appellants' points on appeal, we affirm the judgment of the district court, affirming the Commission's order.

_____

David Puryear, Justice

Before Justices Patterson, Puryear and Powers[*]

Affirmed

Filed:   October 23, 2003

---

[*]   Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).