# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-04-00612-CV

---

**Lydia H. Grotti, M.D., Appellant**

**v.**

**Texas State Board of Medical Examiners, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NO. GN400032, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant, Lydia Grotti, M.D., appeals the district court's final judgment affirming the final order of appellee, Texas State Board of Medical Examiners (the Board), revoking her license to practice medicine in Texas. Dr. Grotti claims that the final order (1) is not supported by substantial evidence, (2) fails to state adequate findings to support the Board's ultimate decision, and (3) is in excess of the Board's authority. Dr. Grotti further contends that the Board (4) violated the Open Meetings Act, (5) improperly adopted findings that were rejected by the administrative law judges, and (6) adopted the final order in violation of her due process rights. In her seventh issue, Dr. Grotti maintains that certain evidence was improperly excluded at her administrative hearing. Because we find no error in either the final order or the Board's actions, we affirm the district court's judgment.

## BACKGROUND

*Factual background*

On December 26, 2000, L.M. was brought by her family to the John Peter Smith Hospital Emergency Department (the Hospital) in Fort Worth. L.M. was an obese sixty-four-year-old woman. In addition, she had a large cancerous mass that had metastasized in her bones, liver, and lungs and completely obstructed her right kidney. At approximately 7:45 p.m., L.M. went into cardiac arrest while sitting with her family in the waiting room. Within minutes, L.M. was moved into a trauma room where hospital staff began administering advanced cardiac life support. Doctor Donald McGraw, the attending ER physician, took charge of the resuscitation effort. Between 7:48 p.m. and 8:15 p.m., L.M. received chest compressions, was placed on a ventilator, was shocked approximately fourteen times, and was administered several drugs designed to stimulate a heart beat. During this time, she had no measurable pulse or blood pressure. At 8:16 p.m., Dr. McGraw was able to detect a pulse, but was still unable to obtain a blood pressure reading. Dr. McGraw then called Dr. Grotti to request that L.M. be transferred to the Intensive Care Unit (ICU).[1]

When Dr. Grotti arrived in the trauma room, L.M. had lost her pulse and resuscitation efforts had resumed. She was told that L.M. had been unconscious for approximately forty-five minutes and that there had been no measurable blood pressure the entire time. Dr. Grotti claims that she asked the team to stop performing chest compressions so that she could check L.M.'s pulse and quickly examine her eyes for signs of brain activity. She could not feel a pulse and her examination

---

[1] Dr. Grotti was in charge of the ICU that evening.

2

of L.M.'s eyes indicated midbrain and brain stem damage. Dr. Grotti then instructed Dr. McGraw to call to transfer L.M. to the ICU only if he was able to stabilize her.

Dr. McGraw called Dr. Grotti at 8:35 p.m. and informed her that L.M. had a stable heart rhythm and a palpable pulse. He further informed her that he was still unable to detect any blood pressure using either the blood pressure cuff or the Doppler method.[2] Dr. Grotti surmised that the pulse was the result of the drugs that had been administered to L.M. and that, as they wore off, the pulse would go away. Nevertheless, Dr. McGraw protested that he could not pronounce L.M. dead when she still had a pulse. Dr. Grotti then returned to the trauma room and found that L.M. still had no measurable blood pressure. Dr. Grotti checked L.M. and detected a palpable pulse in the 60s at 8:50 p.m. She testified that L.M.'s pulse went away immediately after it was checked. At this point, Dr. Grotti determined that the resuscitation efforts had failed, disconnected the ventilator, and pronounced L.M. dead at 8:50 p.m. She then left the room to inform L.M.'s family.

At Dr. Grotti's administrative hearing, several witnesses testified regarding what occurred during the hour immediately following the pronouncement of death. ER nurse Paula Martin testified that, when Dr. Grotti announced that she was going to pronounce L.M. dead, somebody in the room stated that the patient still had a pulse. Martin further testified that she told Dr. Grotti that L.M. was still breathing but Dr. Grotti explained to Martin that what she was observing were "agonal respirations," or ineffectual breaths, signaled by the dying brain stem. Martin asserted that L.M. continued to have regular respirations at a rate of approximately ten-per-

---

[2] The Doppler method uses sound waves to detect blood pressure and is more sensitive than a blood pressure cuff.

3

minute after the ventilator was turned off and stated that the regular respirations continued for about fifteen minutes before becoming irregular. Jennifer Lovins, another ER nurse, testified that after L.M. was pronounced dead, L.M. appeared to be breathing on her own and that the brain monitor continued to detect electrical activity. Additionally, ER technicians Kimberly Short and Leigh Mitchell testified that they observed L.M. breathing after she was pronounced dead. After Dr. Grotti left the room, Short checked L.M. and was able to detect a faint radial pulse. Several witnesses also stated that they observed condensation on L.M.'s endotracheal tube each time she exhaled.[3]

Dr. Grotti conceded that the agonal respirations continued for an hour after she disconnected the ventilator and declared L.M. dead. She suggested that the agonal respirations continued for an abnormally long period of time because the endotracheal tube prevented L.M.'s airway from naturally collapsing.[4] Dr. Grotti also maintained that during this hour L.M. never regained a pulse and the respirations slowly deteriorated. She admitted that L.M.'s situation was upsetting to many of the nurses.[5] Ultimately, Dr. Grotti decided that occluding[6] the endotracheal tube was equivalent to removing it because L.M.'s airway would have naturally occluded if the tube

---

[3] An endotracheal tube is a flexible plastic tube inserted through the mouth down into the trachea. The tube allows for air to pass freely to and from the lungs. In this case, it was connected to the ventilator in order to ensure that L.M. had effective respiration throughout the resuscitation efforts.

[4] The local medical examiner's requirements prevented Dr. Grotti from removing the endotracheal tube.

[5] Dr. Grotti testified that, about an hour after declaring L.M. dead, she walked into the room and was forced to prevent Christi Berglund, the team leader for the ER nurses, from blocking the endotracheal tube with a piece of paper. Nurse Berglund denied Dr. Grotti's allegation.

[6] The term "occlude" means to shut or stop up so as to prevent the passage of something. Webster's Third Int'l Dictionary 1560 (1986).

4

had been removed. Therefore, she occluded the tube with her thumb until the agonal respirations and all detectable electric activity ceased at approximately 9:50 p.m.

### *Procedural background*

The Board brought a disciplinary action against Dr. Grotti, alleging that she suffocated L.M. and violated the Medical Practice Act (the Act). *See* Tex. Occ. Code Ann. §§ 151.001-165.160 (West 2004). The matter was referred to the State Office of Administrative Hearings and a hearing was held before a pair of Administrative Law Judges (ALJs). After the hearing, the ALJs issued a proposal for decision, which included findings of fact, conclusions of law, and a recommended penalty. The ALJs found that (1) L.M. did not have irreversible cessation of spontaneous respirations and circulatory function when she was pronounced dead; (2) Dr. Grotti violated the standard of care by pronouncing L.M. dead; (3) L.M. did not have irreversible cessation of spontaneous respirations at 9:50 p.m. because she continued to have respirations at that time, and there was no indication that the respirations were about to stop; (4) Dr. Grotti occluded L.M.'s endotracheal tube to stop the respirations and bring the death process to conclusion; (5) occluding the endotracheal tube had no medical purpose and was not medically ethical; and (6) Dr. Grotti violated the standard of care when she occluded the endotracheal tube. Consequently, the ALJs concluded that Dr. Grotti violated section 164.052(a)(5) of the Act by occluding L.M.'s endotracheal tube and by failing to apply the statutory requirements for determining L.M.'s death. *See id*. § 164.052(a)(5). The ALJs further concluded that the Board was authorized to discipline Dr. Grotti based on her failure to treat L.M. according to the generally accepted standard of care. Finally, the ALJs recommended that (1) Dr. Grotti be ordered to obtain a concurrent documented second opinion

5

by a licensed physician for orders for withdrawal of life support and be required to undergo eight hours per year of risk management training for a period of three years, and (2) another physician be present when Dr. Grotti counsels patients or their families on end-of-life issues for one year.

In October 2003, the Board adopted the ALJs' findings of facts and conclusions of law. However, the Board chose to delete finding of fact No. 59 which was not a true finding of fact but rather the ALJs' recommendation regarding the appropriate sanction for Dr. Grotti. In its final order, the Board explained that sanctioning Dr. Grotti was subject to its discretion. The Board found the ALJs' recommended sanctions inadequate because they did not address the egregiousness of Dr. Grotti's acts and were too lenient to sufficiently and effectively protect the public's interest. Accordingly, the Board ordered that Dr. Grotti's license be revoked. Dr. Grotti sought review of the Board's order in district court. In August 2004, the district court affirmed the Board's order. This appeal followed.

## DISCUSSION

Dr. Grotti argues the Board employed unfair tactics and procedures throughout the underlying proceedings. According to Dr. Grotti, these actions resulted in a final order that is arbitrary and capricious. She claims that the final order (1) is not supported by substantial evidence, (2) fails to state adequate findings to support the Board's ultimate decision, and (3) is in excess of the Board's authority. She also contends that the Board (4) violated the Open Meetings Act, (5) improperly adopted findings that were rejected by the administrative law judges, and (6) adopted the final order in violation of her due process rights. Finally, she maintains that certain evidence was improperly excluded at her administrative hearing.

6

*Substantial evidence*

In her first issue, Dr. Grotti argues that the Board's final order was made in error because its findings are not supported by substantial evidence. Specifically, Dr. Grotti contends that the ALJs should not have allowed nurses Lovins and Martin to testify at the administrative hearing because the Board failed to disclose their prior statements during discovery. Dr. Grotti claims that the record does not support the Board's findings without the nurses' testimony because no other nurse or physician testified that L.M. exhibited regular respirations after she was pronounced dead and the ventilator was turned off. She maintains that the ALJs' decision to allow the witnesses to testify resulted in an unfair hearing and an indefensible record.

We review the ALJs' refusal to exclude the witnesses' testimony for an abuse of discretion. *See Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 881 (Tex. 2003). The legitimate purposes of discovery sanctions are: (1) to secure compliance with discovery rules; (2) to deter other litigants from similar misconduct; and (3) to punish violators. *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849 (Tex. 1992). Discovery sanctions must be just. *Spohn Hosp.*, 104 S.W.3d at 882; *Chrysler Corp.*, 841 S.W.2d at 849. The supreme court has set forth a two-part test for determining whether a particular sanction is just. First, there must be a direct nexus among the offensive conduct, the offender, and the sanction imposed. *Spohn Hosp.*, 104 S.W.3d at 882. Second, the sanction must neither be excessive nor more severe than necessary to satisfy the purposes of discovery sanctions. *Id*. Case-determinative sanctions should only be imposed in exceptional cases where it is clearly apparent that no lesser sanction would be adequate and it is necessary to address a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules. *Id*. at

7

882-83. Before settling on severe sanctions, a court is required to consider less stringent measures. *Id*.

The statements at issue here were made to the police during a criminal investigation of Dr. Grotti's treatment of L.M. Grotti became aware of the existence of these statements during the cross-examination of ER technician Kimberly Short. The Board argued that Short's statement to the police during their criminal investigation was (1) privileged and (2) did not qualify as a witness statement under civil procedure rule 192.3(h) because Short had not signed, adopted, or approved of the statement. *See* Tex. R. Civ. P. 192.3(h). The ALJs disagreed and ordered the Board to disclose Short's statement and any other similar statements that had not been disclosed. Dr. Grotti insisted that the Board's failure to turn over the statements earlier unfairly prejudiced her case, and that receiving the statements after the hearing had commenced was insufficient to rectify the Board's discovery abuse. At the hearing, she urged the ALJs to sanction the Board by excluding the testimony of any witness who had made a prior statement that had not been disclosed prior to trial.

The exclusion of the Board's witnesses, as requested by Dr. Grotti, would have prevented the Board from presenting the merits of its case. The ALJs stated that their desire was to uncover the truth in the case. Consequently, they determined that it would be unfair to prevent the Board from calling its witnesses. However, the ALJs attempted to fashion an equitable remedy. Initially, the ALJs offered Dr. Grotti a continuance so that she could depose any of the affected witnesses. Dr. Grotti declined the offer, asserting that she did not desire any further delay. The ALJs allowed Dr. Grotti to call any rebuttal witnesses that might be warranted, even if they were not on

8

her witness list. In addition, Dr. Grotti was permitted to recall Dr. McGraw—the only witness who had testified and been released prior to the discovery of the undisclosed witness statements.

Furthermore, the ALJs asked Dr. Grotti for suggestions on how they could rectify the abuse without excluding the witnesses. Dr. Grotti asked for permission to depose the Board's investigator, Sharon Pease, to determine what information she possessed regarding the witness statements. The ALJs denied Dr. Grotti's request to depose Pease, but they ordered the Board to consult with Pease and ascertain if there were any other witness statements that had yet to be disclosed. *See* Tex. Occ. Code Ann. § 164.007(c) (West 2004) (investigative information gathered by Board employees is privileged and not subject to discovery). Dr. Grotti also asked to admit portions of Dr. McGraw's witness statement rather than recalling him, but withdrew that request after the ALJs concluded that the rule of optional completeness would allow the Board to offer the entire statement. *See* Tex. R. Evid. 107.

We cannot conclude on this record that excluding the Board's witnesses was necessary to secure compliance with discovery rules, deter similar misconduct, or punish the Board. *See Spohn Hosp.*, 104 S.W.3d at 882. Furthermore, the record does not indicate that the Board's failure to disclose the statements constituted the type of bad faith or callous disregard for the rules of discovery that would merit the sanction sought by Dr. Grotti. We hold that the ALJs did not abuse their discretion by allowing Lovins and Martin to testify at the administrative hearing because the ALJs took additional procedural steps to effectuate an equitable remedy under the circumstances. Therefore, their testimony, as well as any other witness whose prior statement was not initially disclosed, was properly included in the record. Dr. Grotti's substantial evidence challenge is

9

predicated on the absence of this testimony; she does not argue that the Board's findings are not supported by substantial evidence if the testimony is included in the record. We overrule her first issue.

### Inadequate findings

In her second issue, Dr. Grotti avers that the Board's final order does not state adequate findings to support its decision. In particular, Dr. Grotti claims that conclusions of law No. 3 and No. 5 are not supported by the Board's underlying fact findings. The Board's conclusions state that:

> 3. Respondent [Dr. Grotti] committed a prohibited act or practice within the meaning of Section 164.052(a)(5) of the Act based upon unprofessional or dishonorable conduct that is likely to deceive or defraud the public or injure the public. Respondent's act of unprofessional conduct was her occlusion of L.M.'s endotracheal tube. . . .

> 5. Section 164.051(a)(6) of the Act authorizes the Board to take disciplinary action against Respondent based on Respondent's failure to practice medicine in an acceptable professional manner consistent with public health and welfare within the meaning of the Act.

Dr. Grotti contends that the Board's finding of fact No. 52, which states that her actions did not harm L.M. who was in the process of dying, is inconsistent with its conclusion that her conduct was likely to deceive, defraud or injure the public, or that she failed to practice medicine in an acceptable professional manner consistent with the public health and welfare. She insists that the lack of any finding that her actions were likely to harm L.M. or any member of the public demonstrates that her conduct did not merit discipline under the Act.

10

The legislature expressly provided the Board with the authority to take disciplinary action against a physician that either commits an act prohibited under section 164.052 or fails to practice medicine in an acceptable professional manner consistent with public health and welfare. Tex. Occ. Code Ann. §§ 164.051(a)(1), (a)(6) (West 2004). Section 164.052(a)(5) states that a physician commits a prohibited practice if that person commits unprofessional or dishonorable conduct that is likely to deceive or defraud the public, as provided by section 164.053, or injure the public. *Id*. § 164.052(a)(5). Section 164.053(a)(1) states that unprofessional or dishonorable conduct likely to deceive or defraud the public includes conduct in which the physician commits an act that violates any state or federal law, if the act is connected with the physician's practice of medicine. *Id*. § 164.053(a)(1). A complaint, indictment, or conviction of a violation of law is not necessary for the enforcement of section 164.053(a)(1); proof of the commission of the act while in the practice of medicine is sufficient to justify Board action. *Id*. § 164.053(b). Under the Board's rules, the failure to treat a patient according to the generally accepted standard of care is considered to be inconsistent with public health and welfare and is presumed to be a violation of the Act. 22 Tex. Admin. Code § 190.1(c)(1)(A) (2003).[7]

The Board found that Dr. Grotti violated the standard of care when she occluded L.M.'s endotracheal tube after determining that: (1) Dr. Grotti occluded L.M.'s endotracheal tube to stop L.M.'s respirations and bring the death process to conclusion; (2) there was no medical purpose for Dr. Grotti to occlude L.M.'s endotracheal tube; and (3) the occlusion of L.M.'s

---

[7] The Board's rule has been amended since the Board issued its final order. However, the substance of the relevant portions has not changed, and it is currently located at 22 Texas Administrative Code Section 190.8(1)(A) (2005).

11

endotracheal tube was not medically ethical. Therefore, it was appropriate for the Board to conclude that Dr. Grotti's conduct was inconsistent with public health and welfare and to presume that her actions violated the Act. *See id*. (failure to treat patient according to generally accepted standard of care is considered to be inconsistent with public health and welfare and is presumed to be violation of Act). Consequently, because it is clear that the occlusion of L.M.'s endotracheal tube occurred in connection with Dr. Grotti's practice of medicine, her conduct constituted unprofessional or dishonorable conduct likely to deceive or defraud the public under section 164.053(a)(1) of the Act. Thus, the occlusion of L.M.'s endotracheal tube was a prohibited practice. *See* Tex. Occ. Code Ann. § 164.052(a)(5).

Because the Board's findings support its conclusions that Dr. Grotti committed a prohibited act and that her treatment of L.M. violated the standard of care, it possessed the authority to discipline Dr. Grotti under sections 164.051(a)(1) and 164.051(a)(6) of the Act. We hold that the Board included adequate findings in its final order to support its decision. Accordingly, we overrule Dr. Grotti's second issue.

### *Board authority*

In her third issue, Dr. Grotti claims that the Board's final order exceeds its statutory authority. She avers that the legislature employed the phrases "is likely to deceive or defraud the public . . . or injure the public" and "consistent with public health and welfare" in sections 164.051(a)(6) and 164.052(a)(5) to imply that the Board must find that a physician's actions actually or likely harmed the public in order to justify disciplinary action. Therefore, she argues that the Board's rule, stating that a physician's failure to treat a patient according to the generally accepted

standard of care is inconsistent with public health and welfare, even when there is no finding of harm to the patient or the public, is at odds with the legislature's intent. 22 Tex. Admin. Code § 190.1(c)(1)(A).

Statutory provisions and rules bearing on the same matters must be given a consistent and harmonious meaning. *Texas Alcoholic Beverage Comm'n v. Sanchez*, 96 S.W.3d 483, 487 (Tex. App.—Austin 2002, no pet.); *Texas Citrus Exch. v. Sharp*, 955 S.W.2d 164, 169 (Tex. App.—Austin 1997, no pet.). Rules adopted by an agency must be consistent with the statutory authority of the agency, and they may not impose additional burdens, conditions, or restrictions in excess of the statutory provisions. *Sanchez*, 96 S.W.3d at 487; *Railroad Comm'n v. ARCO Oil & Gas Co.*, 876 S.W.2d 473, 481-82 (Tex. App.—Austin 1994, writ denied). Generally, we construe agency rules in the same manner as statutes, striving to give effect to the agency's intent and following the plain language of the rule unless it is ambiguous. *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999); *City of Alvin v. Public Util. Comm'n of Tex.*, 143 S.W.3d 872, 881 (Tex. App.—Austin 2004, no pet.).

The Board may discipline a physician who commits a prohibited act. Tex. Occ. Code Ann. § 164.051(a)(1). In section 164.052, the legislature provided a list of prohibited practices, one of which is "unprofessional or dishonorable conduct that is *likely* to deceive or defraud the public, as provided by section 164.053, *or* injure the public." *Id*. § 164.052(a)(5) (emphasis added). The use of the word "likely" indicates that a finding of actual harm is unnecessary. Moreover, the fact that a physician could violate section 164.052(a)(5) by committing an unprofessional or dishonorable act, whether or not the act actually injured the public, establishes that a finding of actual or likely

injury is unnecessary. In overruling Dr. Grotti's second issue, we concluded that, despite the Board's finding that Dr. Grotti did not harm L.M., her failure to treat L.M. according to the generally accepted standard of care violated section 164.052(a)(5). Dr. Grotti's decision to hasten the death process without direction from L.M. or her family constituted unprofessional or dishonorable conduct that is likely to deceive or defraud the public under section 164.053.

The Board may also discipline a physician who "fails to practice medicine in an acceptable professional manner consistent with public health and welfare." *Id*. § 164.051(a)(6). The legislature did not define or explain what would constitute a violation of this statute. Accordingly, the Board adopted a rule providing that the failure to practice medicine in an acceptable professional manner consistent with public health and welfare includes, but is not limited to, such acts as: (1) failure to treat a patient according to the generally accepted standard of care; (2) negligence in performing medical services; (3) failure to use proper diligence in one's professional practice; and (4) failure to safeguard against potential complications. *See* 22 Tex. Admin. Code § 190.1(c)(1)(A)-(D). This list indicates that a physician's conduct could be inconsistent with public health and welfare but not result in actual harm to the public. Therefore, construing section 164.051(a)(6) to require a finding of actual or likely harm would unnecessarily limit the scope of the statute. *See Sanchez*, 96 S.W.3d at 487 (we must construe statutory provisions and rules bearing on same matters consistently and harmoniously).

We hold that the Board's order did not exceed its statutory authority because it was not required to find that Dr. Grotti's conduct actually or likely harmed the public in order to subject her to discipline under sections 164.051(a)(1) or (a)(6). However, even if we were to hold that the

14

Board erred with regard to its conclusions pertaining to Dr. Grotti's failure to treat L.M. according to the generally accepted standard of care, she does not challenge the Board's conclusion that she committed a prohibited act by failing to apply the statutory requirements for determining L.M.'s death. Therefore, Dr. Grotti would still be subject to discipline under section 164.051(a)(1). Dr. Grotti's third issue is overruled.

### *Open meetings act*

In her fourth issue, Dr. Grotti suggests that the Board violated the Open Meetings Act when it adopted its final order on October 28, 2003. *See* Tex. Gov't Code Ann. §§ 551.001-.146 (West 2004). Specifically, she claims that the Board violated government code sections 551.101 and 551.103 by improperly going into an executive session.[8] A governmental body may not conduct a statutorily allowed closed meeting unless it first convenes in an open meeting, for which notice has been given and during which the presiding officer publicly: (1) announces that a closed meeting will be held; and (2) identifies the statutory section that permits the closed meeting. *Id*. § 551.101. A governmental body must either keep a certified agenda or make a tape recording of each closed meeting. *Id*. § 551.103. Any action taken by a governmental body in violation of either of these statutes is voidable. *Id*. § 551.141.

The record contains no evidence indicating that the Board went into executive session during its open meeting on October 28, 2003. Dr. Grotti points us to the minutes of the Board's open

---

[8] An executive session is a closed meeting in which the Board may conduct deliberations relating to license applications and disciplinary action. Tex. Occ. Code Ann. § 152.009 (West 2004).

meeting on October 10, 2003, at which the Board presented the ALJs' proposal for decision. The minutes establish that the Board went into executive session three times during the meeting. Before each session, a Board member moved to go into executive session, which was seconded by another member. Additionally, the moving Board member announced the statutory authority permitting the executive session. The minutes also state that no action was taken during any of the executive sessions and that a certified agenda of each session was made. The third executive session occurred immediately before the Board considered the proposal for decision. The announced purpose of the session was:

> To obtain the advice of counsel concerning pending or contemplated litigation, deliberations concerning licensure applications, and/or possible disciplinary action under the authority of the Open Meetings Act, Government Code, § 551.071; and the Medical Practice Act, Texas Occupations Code Annotated, §§ 152.009, 160.006, and 164.007.

Dr. Grotti claims that the Board's stated grounds for going into executive session are inadequate and inapplicable. She is correct that occupations code sections 160.006 and 164.007 do not authorize the Board to go into executive session. However, government code section 551.071 and occupations code section 152.009 permit the Board to go into executive session to discuss pending disciplinary actions and to consult with its attorney regarding pending litigation. *Id*. § 551.071(1)(A); Tex. Occ. Code Ann. § 152.009 (West 2004). Both of these issues are applicable to Dr. Grotti's situation. Therefore, we hold that the Board did not violate the Open Meetings Act. We overrule Dr. Grotti's fourth issue.

16

*Disciplinary recommendations*

In her fifth issue, Dr. Grotti claims that the Board improperly modified the ALJs' proposal for decision by eliminating finding of fact No. 59 from its final order. The ALJs' proposed finding of fact No. 59 read as follows:

> In view of the circumstances associated with violations pertaining to L.M., the following restrictions should be placed on the Respondent's [Dr. Grotti] license:
>
> a. For a period of three years, Respondent be ordered to obtain a concurrent documented second opinion by a licensed physician for orders for withdrawal of life support for a period of three years.
>
> b. For a three-year period, Respondent shall be required to undergo eight hours per year of risk management training specifically designed to focus on physician practice and documentation issues.
>
> c. For a period of one year, during periods of counseling patients or their families regarding "end of life" issues, another licensed physician shall be present to observe.

The Board explained in its final order that it chose not to accept finding of fact No. 59 because it considered the finding to be a recommended sanction rather than a true finding of fact. The Board explained further that the ALJs' recommended sanctions (1) do not address the egregiousness of Dr. Grotti's conduct, (2) are too lenient to be effective, and (3) are insufficient to protect the public's interest. Finally, the Board asserted that if the recommendations were followed Dr. Grotti would suffer no real negative consequences for her violations, and other licensees could assume that similar violations would have similar consequences. Despite this explanation, Dr. Grotti contends that the Board's decision to eliminate finding of fact No. 59 from the final order violates government code section 2001.058(e). *See* Tex. Gov't Code Ann. § 2001.058(e) (West 2000).

17

An agency may modify an ALJ's order or change an ALJ's finding of fact or conclusion of law only if the agency determines that (1) the ALJ improperly applied or interpreted the law, agency rules or policies, or prior administrative decisions; (2) the ALJ based her decision on a prior administrative decision that is incorrect; or (3) a finding of fact contains a technical error requiring correction. *Id*. The agency is required to explain with particularity its specific reason and legal basis for each change made. *Id*.; *Levy v. Texas State Bd. of Med. Exam'rs*, 966 S.W.2d 813, 815-16 (Tex. App.—Austin 1998, no pet.).

We recently addressed a similar situation in *Granek v. Texas State Board of Medical Examiners*, No. 03-03-00698-CV, 2005 Tex. App. LEXIS 6954 (Tex. App.—Austin Aug. 26, 2005, no pet.). In *Granek*, the ALJ's recommended sanctions were proposed as two separate conclusions of law. *Id*. at *7. The Board rejected the conclusions explaining that they were actually recommended sanctions and that it was up to the Board to determine what the appropriate sanction should be. *Id*. at *8-10, *50. The Board rejected the ALJ's lesser sanctions and concluded that the revocation of Granek's license was necessary to protect the public effectively. *Id*. at *50. The Board included a lengthy paragraph outlining its justifications for revoking Granek's license. *Id*. at *51. We determined that none of the justifications expressed by the Board were supported by its own findings and that several were contradictory. *Id*. Because the Board's explanation contained factual assertions that were not supported by the evidence and were even inconsistent with its own findings, we held that the Board violated government code section 2001.058(e) and was arbitrary and capricious. *Id*. at *53.

18

As in *Granek*, the Board here maintains that government code section 2001.058(e) does not apply to the facts of this case because the ALJs' recommendation is not truly a finding of fact. We agree that the mere labeling of a recommended sanction as a finding of fact is insufficient to presumptively bind the Board and implicate government code section 2001.058(e). *Id*. at \*49 ("Board is not required to give presumptively binding effect to an ALJ's recommendations regarding sanctions in the same manner as with other findings of fact and conclusions of law.").

Contrary to its actions in *Granek*, here the Board did comply with government code section 2001.058(e) by stating the specific reason and legal basis for eliminating finding of fact No. 59. The Board initially stated that it is charged with the duty to make the final decision in disciplinary matters, including the assessment of sanctions. *See* Tex. Occ. Code Ann. § 164.001. It explained further that the ALJs' recommended sanctions were too lenient to effectively punish Dr. Grotti for "suffocating" a patient.[9] Although the Board's findings state that Dr. Grotti's actions did not harm L.M. because she was in the process of dying, they also support its contention that she suffocated L.M. The Board's explanation here is distinguishable from *Granek* because the only factual assertion is supported by the underlying evidence. Dr. Grotti concedes that the Board has the authority to determine the sanction for a violation of the Act. Moreover, the Board's explanation does not modify any of the ALJs' factual findings; it merely restates them in a way that is displeasing to Dr. Grotti. We overrule Dr. Grotti's fifth issue.

---

[9] In a separate case, Dr. Grotti was convicted of criminally negligent homicide based on her actions in this case. Grotti's criminal conviction was pending on appeal at the time the Board issued its final order.

*Due process*

In her sixth issue, Dr. Grotti claims that the Board adopted the final order in violation of her due process rights. On October 10, 2003, Board member Dr. Roberta Kalafut moved to accept the ALJs' proposal for decision, except for their recommended sanctions. The motion passed and Dr. Grotti's license was revoked. In 2002, Dr. Kalafut served on the disciplinary panel that temporarily suspended Dr. Grotti's license, pending the Board's final determination. Dr. Grotti argues that Dr. Kalafut's participation in the 2003 Board meeting was improper and unfair because, as a panelist on the temporary suspension panel, she was privy to evidence and testimony that was not before the Board and not made part of the administrative record. Dr. Grotti suggests that Dr. Kalafut improperly influenced the Board to revoke her license.

Due process requires that parties be accorded a full and fair hearing on disputed fact issues. *See Hammack v. Public Util. Comm'n*, 131 S.W.3d 713, 731 (Tex. App.—Austin 2004, pet. denied). We presume that decision makers are unbiased. *Id*. In order to overcome this presumption, Dr. Grotti must establish that Dr. Kalafut's participation on the temporary suspension panel caused her mind to be irrevocably closed to the matters at issue in the Board's final order, thus rendering her incapable of judging Dr. Grotti's case based on the evidence and testimony presented during her administrative hearing. *Id*.

The record does not indicate what role Dr. Kalafut played on the temporary suspension panel. Nor does it establish that she unduly influenced the Board's final decision. The record only shows that Dr. Kalafut made a motion at the 2003 open meeting that was seconded by another Board member. Dr. Grotti's bare assertion that Dr. Kalafut played a "leading role" in the

20

decision to revoke her license based on her "pre-determined outcome" is insufficient to overcome the presumption that Dr. Kalafut conducted herself in a fair and unbiased manner. *Id.* Moreover, Dr. Kalafut did not violate the Act or any of the Board's rules by serving on the temporary suspension panel and participating in the Board's final determination of Dr. Grotti's case. We overrule Dr. Grotti's sixth issue.

### *Peer review materials*

In her final issue, Dr. Grotti argues that the ALJs improperly excluded evidence relating to her peer review proceeding that occurred prior to her hearing. The ALJs concluded that the peer review materials were privileged and could not be admitted unless Dr. Grotti obtained a waiver of confidentiality. Dr. Grotti contends that the ALJs' conclusion is erroneous, and that it is based on an improper reading of the Act and the Board's rules pertaining to the admission of peer review materials at administrative hearings. Assuming without deciding that the ALJs improperly excluded the peer review materials, we conclude that there was no harm. Tex. R. App. P. 44.1 (judgment may not be reversed on appeal unless it is shown that error probably caused rendition of improper judgment or prevented appellant from properly presenting case on appeal).

Dr. Grotti argued to the district court that her intended purpose in seeking to admit the materials was to show "what the decision was in the peer review proceeding at the hospital." The peer review committee waived the privilege associated with some of the contested materials to allow a copy of its decision to be admitted at Dr. Grotti's administrative hearing. Moreover, a review of the ALJs' proposal for decision reveals that they did consider the peer review committee's decision. In fact, they noted that the wording of their recommended sanctions was actually derived from

21

restrictions placed on Dr. Grotti's license by the peer review committee. Given that the portion of the peer review materials establishing the committee's decision was admitted, Dr. Grotti has not shown that the exclusion of the rest of the materials resulted in the rendition of an improper judgment or prevented her from fully presenting her case on appeal. *Id*. We overrule Dr. Grotti's final issue.

## CONCLUSION

Because we have concluded that the final order is neither erroneous nor the product of improper conduct by the Board or the ALJs, we affirm the district court's judgment affirming the Board's revocation of Dr. Grotti's license to practice medicine in Texas.

_____

Bea Ann Smith, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed

Filed:   October 6, 2005

22