# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

===============================

## ON MOTION FOR REHEARING

===============================

### NO. 03-03-00461-CV
### NO. 03-03-00462-CV

**Appellants, Office of Public Utility Counsel; and Cities of Abilene, San Angelo and Vernon //Cross-Appellants, Public Utility Commission of Texas; AEP Texas North Company, f/k/a West Texas Utilities Company and WTU Retail Energy, L.P., f/k/a Mutual Energy WTU, L.P.**

**v.**

**Appellee, Public Utility Commission of Texas//Cross-Appellees, Office of Public Utility Counsel; Cities of Abilene, San Angelo and Vernon**

**&**

**Appellants, Office of Public Utility Counsel and Steering Committee of Cities of Camp Wood, Carrizo Springs, Corpus Christi, Eagle Pass, Edinburg, Edna, Harlingen, Laredo, McAllen, Mathis, Odem, Orange Grove, Pearsall, Roma, San Benito, Sinton, Taft, and Victoria//Cross-Appellants, Public Utility Commission of Texas; Constellation New Energy, Inc.; AEP Texas Central Company, f/k/a Central Power and Light Company; and CPL Retail Energy, L.P., f/k/a Mutual Energy CPL, L.P.**

**v.**

**Appellee, Public Utility Commission of Texas//Cross-Appellees, Office of Public Utility Counsel and Steering Committee of Cities Served by Central Power & Light Co.**

---

**FROM THE DISTRICT COURTS OF TRAVIS COUNTY, 201ST & 98TH JUDICIAL DISTRICTS NOS. GV2-00906 & GN2-01289, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING**

**O P I N I O N**

Our opinion and judgment issued on July 28, 2005, are withdrawn, and the following opinion is substituted.

In 1999, the Texas Legislature amended the Public Utility Regulatory Act, restructuring and partially deregulating the electric industry in Texas. *See* Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543, 2543-2625 (codified at Tex. Util. Code Ann. §§ 39.001-.910 (West Supp. 2004-05)) ("PURA"). As part of restructuring, electric utility companies were required to "unbundle" into three distinct entities: (1) a power generation company, (2) a transmission and distribution company, and (3) a retail electric provider ("REP"). PURA § 39.051. Some unbundled units were independent, and others remained affiliated with the electric utility. *City of Corpus Christi v. Public Util. Comm'n*, 51 S.W.3d 231, 237 (Tex. 2001). Affiliated REPs were required, beginning January 1, 2002, to sell electricity to residential and small commercial customers at a discounted rate called the price to beat ("PTB"). PURA § 39.202(a). The PTB was to be set by the Public Utility Commission ("Commission") at "six percent less than the affiliated electric utility's corresponding average residential and small commercial rates . . . in effect on January 1, 1999, adjusted to reflect the fuel factor." *Id*.

This appeal concerns the process of approving the fuel factor component of the PTB. *See id.* § 39.202 (a), (b). The main issues on appeal are whether the expenses sought by electric utilities Central Power & Light Company ("CPL") and West Texas Utility Company ("WTU"),[1] were "reasonable" estimates of "eligible" projected fuel expenses, and whether procedural

---

[1] CPL and WTU are owned by the same parent company, AEP, Inc.

2

irregularities tainted the fuel factor determinations. *See City of El Paso v. El Paso Elec. Co.*, 851 S.W.2d 896, 897-98 (Tex. App.—Austin 1993, writ denied).[2]  After a contested-case hearing in which the eligibility and the reasonableness of portions of CPL's and WTU's expenses were questioned, the Commission approved the disputed expenses and included them in the fuel factor component of the PTB.  On appeal, the district court affirmed the Commission's decision in part and reversed it in part.  We will affirm in part and reverse in part the district court's judgment.

## BACKGROUND

The Commission set the PTB affiliated retail electric providers must charge to certain classes of customers to protect residential and small commercial customers from adverse impacts of competition in the transition to deregulation.  The PTB is the base rate of the utility as modified by a "fixed fuel factor," an adjustment accounting for changes in fuel prices.  *Cities of Alvin v. Public Util. Comm'n*, 143 S.W.3d 872, 875 (Tex. App.—Austin 2004, no pet.).  Fuel factors are calculated by dividing the electric utility's projected net eligible fuel expenses[3] by the corresponding projected

---

[2]  In *City of El Paso v. El Paso Elec. Co.*, we explained that an electric utility is entitled to recover through its rates sums expended for reasonable and necessary operating expenses, including the cost of fuel-related items.  851 S.W.2d 896, 898 (Tex. App.—Austin 1993, writ denied).  We also noted that an electric utility incurs fuel costs directly when it generates its own electric power and indirectly, as an element of the price paid, when the utility buys electric power from another. *Id*.

[3]  Eligible fuel expenses are "defined in § 25.236(a) of this title (relating to Recovery of Fuel Costs)."  16 Tex. Admin. Code § 25.237 (2005).  Eligible fuel expenses include expenses recorded in the Federal Energy Regulatory Commission ("FERC") Uniform System of Accounts, numbers 501, 503, 518, 536, 547, 555, and 565, with certain limitations, but in special circumstances, an electric utility may recover as eligible expenses fuel or related expenses otherwise excluded by the limitations where the commission considers whether those expenses are related to increased reliability, lower costs or other benefits to ratepayers.  *Id*. § 25.236(a).  Here, the parties do not argue whether these expenses are properly included in the FERC accounts, but whether the Commission's

3

kilowatt-hour sales for the period in which the fuel factors are expected to be in effect. 16 Tex. Admin. Code § 25.237(a)(1) (2005). The expenses recovered through the fuel factor are reasonable estimates of the electric utility's eligible fuel expenses during the period that the fuel factor is expected to be in effect. *Id*. § 25.237(c)(1)(A).

The process of setting the fuel-factor component of CPL's and WTU's initial PTB rate began with their applications to the Commission seeking approval of their projected fuel expenses. *See* Tex. Pub. Util. Comm'n, *Application of Central Power and Light Company to Implement the Fuel Fact Component of the Price to Beat Rates*, Docket No. 24195 (June 5, 2001); Tex. Pub. Util. Comm'n, *Application of West Texas Utility Company to Implement the Fuel Factor Component of the Price to Beat Rates*, Docket No. 24335 (July 3, 2001); PURA § 39.202(a), (b); 16 Tex. Admin. Code § 25.41(f)(3)(A) (2005) (application process for PTB). The Commission referred both applications to the State Office of Administrative Hearings ("SOAH") for contested-case hearings. *See* PURA § 14.053 (West 1998); Tex. Gov't Code Ann. § 2003.049(b) (West 2000); 16 Tex. Admin. Code § 22.207 (2005). The purpose of each proceeding was to determine whether the expenses CPL and WTU sought to recover were eligible and reasonable fuel expenses. *See* PURA § 36.003(a); 16 Tex. Admin. Code §§ 25.235(a), .237(a) (2005).

---

comments in setting the PTB rule and PURA's mandate that each utility's fuel factor be set as of December 31, 2001, categorically exclude these otherwise eligible expenses. *See id.* § 25.237; PURA § 39.202(b). Thus, we will not determine whether the excluded expenses are properly included in the FERC accounts.

AES New Energy, Inc./The New Power Company (jointly, "New Power")[4] intervened in support of both applications. The Office of Public Utility Council ("OPC"),[5] the Steering Committee of Cities served by CPL ("Steering Committee"), and the Cities of Abilene, San Angelo, and Vernon ("Cities") intervened in opposition to CPL's and WTU's applications. OPC, Steering Committee, and Cities argued that the expenses CPL and WTU would incur under deregulation as a result of competition were ineligible for inclusion in the fuel factor. These included the capacity auction expense,[6] the unaccounted for energy expense ("UFE"),[7] the transmission-congestion-management expense ("TCM"), the qualified scheduling entity expense ("QSE"),[8] and the single

---

[4] AES New Energy, Inc. and the New Power Company intervened in court below but the New Power Company filed for bankruptcy shortly thereafter and withdrew its intervention. Constellation Energy Commodities Group acquired AES New Energy after it filed its intervention below and renamed it Constellation New Energy, Inc. Constellation New Energy. Inc. is a party before the Court in this appeal. For simplicity, we will refer to the party before the Court as Constellation and the former New Power Company as New Power.

[5] OPC is a state agency representing the interests of residential and small commercial consumers. PURA § 13.001 (West 1998).

[6] PURA section 39.153 requires an electric utility to sell 15 percent of its electric capacity at auction sixty days prior to deregulation. CPL and WTU argued that, because utilities could not provide electricity to 100 percent of their customer bases with their remaining 85 percent capacity, they would necessarily incur costs of purchasing replacement power.

[7] UFE is the difference between metered generation (supply) and metered consumption (delivery). When an electric utility has generated more electricity than has been accounted for in delivery, the costs of generation are not fully covered by incoming revenues. CPL and WTU attempted to include the wasted electricity as a fuel expense.

[8] QSE and TCM expenses are part of a utility's congestion management fee, a new cost associated with "the transition to single control area operations in ERCOT"; ERCOT, the Electric Reliability Counsel of Texas, is the interconnected network for transmitting power over a single grid across the state. *See* PURA § 31.002(5) (West Supp. 2004).

5

area/multi-area management expense.[9] OPC, Steering Committee, and Cities also challenged the reasonableness of CPL's and WTU's included coal, natural gas, and purchased-power costs. They contended that because the price for coal, natural gas, and purchased power had dropped significantly after the initial applications to set the fuel factors, the updated prices should be used to estimate projected fuel costs. The Cities opposed WTU's request to include railcar depreciation expenses.

The Commission held all of the disputed expenses eligible for inclusion in the fuel factors;[10] approved CPL's and WTU's coal, natural gas, and purchased power estimates, finding that their costs were generally accurate because they were based on existing contracts and not specifically tied to the market price of natural gas;[11] and approved WTU's railcar-depreciation expense.

OPC, Steering Committee, and Cities sued the Commission, seeking judicial review of its decisions.[12] In CPL's case, the district court reversed the Commission's decision to approve

---

[9] As a result of deregulation, it was necessary for CPL and WTU to terminate contracts with other electric utilities to jointly dispatch electricity, thereby improving operating efficiency by reducing the number of hours during which inefficient gas-fired units are operated. They argued that the lost efficiencies from these single area/multi-area dispatch arrangements were eligible expenses to be considered in their fuel factor calculations.

[10] *See Application of Central Power and Light Company*, Docket No. 24195 (Order on Rehearing, Feb. 7, 2002); Tex. Pub. Util. Comm'n, *Application of West Texas Utility Company*, Docket No. 24335 (Order, Dec. 21, 2001).

[11] The Commission adjusted one of CPL's natural-gas contracts, which was indexed to the market price of natural gas.

[12] OPC and Cities separately filed suit against the Commission regarding CPL's application. Their suits were consolidated into one case, GN2-0289. Steering Committee and OPC also filed suit against the Commission regarding WTU's application, and their causes were also consolidated into one case, GV2-00906. Both consolidated cases were tried together.

6

the capacity-auction expense, finding that the Commission's findings were not supported by substantial evidence and that in approving the capacity-auction expense the Commission improperly shifted the burden of proof from the electric utility to the intervenors. The court affirmed the Commission's decision in all other respects. In WTU's case, the district court also reversed the Commission's decision concerning the capacity-auction expense for lack of substantial evidence and improper shifting of the burden of proof. It also reversed the Commission's allowance for UFE because the Commission's decision was based on the treatment of UFE in other PTB proceedings. The Court affirmed the Commission's order in all other respects. All parties have appealed the district court's decision, and we have consolidated the appeals.

CPL, WTU, the Commission, and Constellation appeal the district court's ruling reversing the Commission's findings regarding the capacity-auction expense. WTU challenges the district court's ruling overturning the Commission's decision allowing WTU to recover UFE expenses. In both cases, OPC, Steering Committee, and Cities appeal the court's ruling approving the Commission's decision to allow the disputed expenses. They also accuse the Commission of acting arbitrarily and capriciously by excluding testimony concerning the price of natural gas and affording CPL and WTU preferential treatment in calculating natural gas costs. Steering Committee and Cities accuse two Commissioners of engaging in *ex parte* communications with an Enron affiliate, New Power, during the pendency of the proceedings and of requesting and receiving evidence outside the record concerning "headroom." Steering Committee also alleges that the Commission erred by relying on non-record facts in approving UFE fees in CPL's case and challenges the reasonableness of CPL's railcar depreciation expense.

7

## DISCUSSION

### Fuel-related expenses

The parties' arguments fall into two categories: whether the disputed expenses were eligible fuel expenses and whether they were reasonable.

### Eligibility

One of the main points of contention in both proceedings was whether CPL and WTU could recover expenses that would occur only in a deregulated environment. The disputed expenses are those relating to the capacity auction, single/multi-area dispatch, QSE, TCM and UFE. OPC, Steering Committee, and Cities argue that the fuel factor should be calculated as though the system of regulation continued, notwithstanding known changes to the marketplace. This has been referred to as the "continuing regulation model" and would exclude all expenses arising from deregulation.

The Commission contends that it approved each of these expenses because the traditional method of determining fuel factors requires that "fuel factors be calculated using reasonable estimates of the electric utility's eligible fuel expense during the period for which the fuel factor is expected to be in effect," here, the 2002 rate year, and because fuel factors should include known and measurable expenses that would occur in 2002 after deregulation regardless of whether those expenses existed before deregulation. The Commission's decision to approve the disputed expenses was based on its interpretation of section 39.202(b) and 16 Tex. Admin. Code section 25.41 ("PTB rule").

The correct construction of section 39.202 is a question of law that we review *de novo*. *Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). In construing a statute, we determine and implement the legislature's intent. *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 484 (Tex.1998). We will give weight to the Commission's interpretation of its own powers if it is reasonable and consistent with the statute. *Cities of Austin, Dallas, Ft. Worth & Hereford v. Southwestern Bell Tel.*, 92 S.W.3d 434, 441-42 (Tex. 2002).

The Commission's interpretation of its own regulations is entitled to deference by the courts. *Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991). "Our review is limited to determining whether the administrative interpretation is plainly erroneous or inconsistent with the regulation." *Id*. However, if the Commission has failed to follow the clear, unambiguous language of its own regulation, we must reverse its action as arbitrary and capricious. *Id*.; *Power Res. Group, Inc. v. Public Util. Comm'n of Tex.*, 73 S.W.3d 354, 357 (Tex. App.—Austin 2002, pet. denied).

PURA section 39.202(b) reads: "The Commission shall determine the fuel factor for each electric utility as of December 31, 2001." In adopting its PTB rule, the Commission elaborated:

> The commission agrees that it is critical that the initial price to beat fuel factor be set as accurately as possible, but disagrees with any assertions that the fuel factor should reflect anything other than the historic fuel mix of the integrated utility, as this is how the fuel factor would have been set under continuing regulation (with allowance for that fuel mix to change as the utility's portfolio changes).

26 Tex. Reg. 2680, 2692 (2001). It also said:

> The commission finds, that as stated in subsection (f)(3)(B), the proper reading of PURA [Public Utility Regulatory Act] § 39.202(b) is that the final fuel factor should

9

be set in the traditional manner as outlined by the current fuel rule. While the commission recognizes that the inclusion of fuel factor based on historical integrated utility fuel costs as part of the price to beat appears inconsistent with the market structure under [Senate Bill] 7, where REPs are prohibited from owning generation, the commission finds that the price to beat was intended to be calculated from each utility's regulated rate in effect on January 1, 1999, discounted by 6.0% and updated for a final fuel factor. Utility-specific issues are to be addressed in the individual fuel factor cases, within the confines of this finding.

*Id.* at 2701.

The challengers argue that, by authorizing the Commission to determine the fuel factor for the "electric utility as of December 31, 2001," the legislature intended for the Commission to approve only the sorts of fuel expenses an integrated "electric utility" would have incurred in a regulated environment for two reasons: (1) section 39.202(b) uses the term "electric utility," which does not include a "retail electric provider," and (2) it uses the phrase "as of December 31, 2001," the day before deregulation was to commence. They believe that the Commission's rules support this reading because they mandate that the fuel factor reflect the historic fuel mix of the integrated utility, as that is how it would have been set under continuing regulation.

The Commission now argues, along with the former utilities, that in allowing expenses for the capacity-auction, UFE, single area/multi-area dispatch, QSE, and TCM costs in the fuel factor calculation for CPL and WTU, it was permissibly taking into account "known and measurable" expenses that would necessarily occur in the rate year, 2002, whether or not they occurred as a result of deregulation.[13] We must now determine whether the Commission's action

---

[13] In fact, WTU and CPL argue in their post-submission letter that the costs at issue were neither REP costs nor costs occurring as a result of deregulation, and that some of them began to occur even before utilities unbundled.

was arbitrary, capricious, or inconsistent with the regulation or statute. *See Gulf States Utils. Co.*, 809 S.W.2d at 207; *Cities of Austin, Dallas, Ft. Worth & Hereford*, 92 S.W.3d at 441-42.

The Commission argues that it set each of these fuel factors exactly as it would have set them under a continuing regulation scenario; that is, in considering the disputed expenses, it set the fuel factor in the traditional manner as outlined in the current fuel rule. *See* 26 Tex. Reg. 2680, 2692, 2701. Traditionally, fuel factors are "calculated using reasonable estimates of the electric utility's eligible fuel expense during the period in which the fuel factor is expected to be in effect," here the 2002 rate year. 16 Tex. Admin. Code §§ 25.237(c)(1)(A) (utility revising fuel factor must show reasonable estimate for period in effect), 25.41(f)(3)(B) (setting year as 2002). In its attempt to set these fuel factors as accurately as possible, the Commission reasoned that it need not ignore known and measurable events that would occur in the 2002 rate year.[14] It calculated the fuel factors using reasonable estimates of actual expenses during the period in which the fuel factors would be in effect. This interpretation is not plainly erroneous or inconsistent with the Commission's regulations or PURA, and therefore we cannot hold it arbitrary and capricious. *See Gulf States Utils. Co.*, 809 S.W.2d at 207.

Furthermore, the Commission's decision to include the expenses is not inconsistent with the statutory directive to set the fuel factor for the "electric utility as of December 31, 2001." The statutory regime provides for the Commission to determine the fuel factor, and is silent regarding how fuel factors are set. We are not persuaded by the argument that the use of the term

---

[14] The Commission has the authority to incorporate known and measurable changes to test year data at its discretion. *See Central Power & Light Co. v. Public Util. Comm'n*, 36 S.W.3d 547, 563 (Tex. App.—Austin 2000, pet. denied) (citing *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 188 (Tex. 1994)).

11

"electric utility" mandated a myopic snapshot limited to expenses borne by the bundled electric utility on its last day of existence. When the legislature enacted the rule, before unbundling, electric utilities and not retail electric providers were the entities in existence. When it directed the Commission to set the fuel factor for the electric utility in PURA section 39.202(b), the legislature intended for the retail electric provider charging the PTB to use that fuel factor beginning in 2002. *See* PURA § 39.202(a) (requiring retail electric providers to charge the PTB determined for utility). It would be illogical to hold that, when the statute required the fuel factor component of the PTB be set "for" the electric utility, and the retail electric provider was the entity required to charge the PTB, the legislature affirmatively intended *not* to set a fuel factor "for" the affiliated retail electric provider.[15] *See McLane Co. v. Strayhorn*, 148 S.W.3d 644, 650 (Tex. App.—Austin 2004, pet. denied) (we do not attribute to legislature intent to work foolish or absurd results). We decline to read an expression of legislative intent to specify a single detailed scheme of calculating the fuel factor component of the PTB into the term "electric utility," particularly where that scheme conflicts with that of the agency charged with determining the PTB. *See* PURA § 39.202 (a)-(b) (authorizing Commission to set PTB and determine base rates and fuel factor). Similarly, the language, "as of December 31, 2001" does not indicate to us a substantive edict as to *how* a fuel factor should be set; it merely dictates *when*. We believe that the legislature did not intend to override or change the practice of taking into account cost estimates for the period in which a fuel factor will be in effect

---

[15] REPs do not bear fuel costs except as reflected in their costs in obtaining power. However, the fuel factor still determines the PTB that REPs are required to charge certain customers. Hence, while recognizing that the REP does not directly incur any costs included in the fuel factor, we realize that the fuel factor used to determine the REP's PTB is in some sense set "for" the REP.

12

when setting that fuel factor by specifying a date by which the Commission should set the fuel factors for 2002. The Commission's acts did not contravene the statutory language of PURA.

In short, these fuel factors *were* set in the traditional manner as outlined by the current fuel rule: the Commission calculated them as of December 31, using reasonable estimates of expenses during the period they would be in effect, the rate year 2002.[16] Thus, Steering Committee's, OPC's and Cities' arguments regarding the "continuing regulation" model do not properly address whether the Commission erred. We hold that the Commission was within its authority to determine that the capacity-auction, UFE, QSE, TCM, and single area/multi-area dispatch expenses were eligible fuel expenses to be used in setting the fuel factors. We overrule OPC's first issue in both WTU's case and CPL's case insofar as it addresses these expenses and Steering Committee's and Cities' second issues.

**Reasonability and Substantial Evidence**

Steering Committee and Cities appeal the district court's judgments affirming the Commission's estimates of CPL's and WTU's coal and purchased power[17] estimates. Steering Committee adds its argument that the Commission erred in allowing CPL to include railcar-depreciation expenses; Steering Committee and Cities assert that the Commission's findings concerning all three expenses were unreasonable and not supported by substantial evidence. The

---

[16] We agree with the Commission that the contest between the "continuing regulation" model and the "deregulated market model" is largely illusory; the real question is whether allowing these particular expenses, which coincide with deregulation, fits within the fuel rule's guidelines for calculating a fuel factor.

[17] Purchased power costs are those costs associated with the purchase, by contract or on the open market, of additional power. *See* 16 Tex. Admin. Code § 25.5(1), (50), (94) (2005).

13

Commission, CPL, WTU, and Constellation appeal the district court's ruling that the Commission's finding 17A (accounting for a loss of 15% of generating capacity but still assuming 100% customer load after deregulation)[18] was not supported by substantial evidence. WTU appeals the district court's ruling that there was insufficient evidence to support its UFE allowance.

We review Commission findings under the substantial evidence rule. *See* PURA § 15.001 (West 1998) ("Any party to a proceeding before the commission is entitled to judicial review under the substantial evidence rule."). Under the substantial evidence rule, we may not inject our own judgment but must defer to that of the Commission on the weight of the evidence on questions committed to its discretion.[19] Tex. Gov't Code Ann. § 2001.174 (West 2000). We must presume that the Commission's order is supported by substantial evidence; the complaining party has the burden to overcome this presumption. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994); *Hammack v. Public Util. Comm'n*, 131 S.W.3d 713, 725 (Tex. App.—Austin 2004, pet. denied). "At its core, the substantial evidence rule is a reasonableness test or a rational basis test"; if the order is reasonable, we do not concern ourselves with its correctness. *City of El Paso*, 883 S.W.2d at 185 (citing *Railroad Comm'n of Texas v. Pend Oreille Oil & Gas Co.*, 817 S.W.2d 36, 41 (Tex. 1991)).

---

[18] Finding 17A was identical in each of the proceedings at the Commission.

[19] PURA gives the Commission the authority to regulate and supervise utilities, to fix and regulate their rates, and to ensure that rates and services are just and reasonable. *Public Util. Comm'n v. GTE-Southwest, Inc.*, 901 S.W.2d 401, 407 (Tex. 1995).

14

*Coal costs*

Steering Committee and Cities argue that, because CPL's and WTU's original coal price estimates were based on an aberrant spike in coal prices and unreasonable estimates that coal prices would remain high in 2002, the level the Commission used was unsupported by substantial evidence. They claimed that there was no evidence contradicting their assertion that the historical price of coal was much lower.

To support their coal estimates, CPL and WTU presented the testimony of Marguerite Mills, who stated that both forecasts were based on actual, contractual coal prices and spot coal forecasts. She contended that Steering Committee's and Cities' coal estimates were unreasonably low and explained, at length, the history and current trends of coal prices as well as her disagreement with the Cities' witness regarding the feasibility of using cheaper coal.

At best, Steering Committee and Cities have only shown that the evidence is conflicting. Because there is credible evidence to support the Commission's findings, Steering Committee and Cities have failed to show that the Commission's decision was unreasonable. *City of El Paso*, 883 S.W.2d at 185. We overrule Steering Committee's and Cities' fourth issues.

*Purchased power costs*

Steering Committee and Cities argue that CPL's and WTU's purchased power estimates, based on estimates of market prices on April 6, 2001, were too high because, by mid-July, the price had dropped approximately $33 to $37 per megawatt hour due to a decrease in the price of natural gas.

15

The Commission declined to update the purchased power costs in October when it updated the natural gas cost under the PTB rule because the Commission's rules did not contemplate an update for purchased power costs. It also held that the methodologies employed by both CPL and WTU provided legitimate estimates of 2002 purchased power costs. In CPL's case, Stephan Haynes, managing director of risk oversight for a subsidiary of CPL's and WTU's parent company, testified to projected prices based on affiliated and independent companies' estimates, and the ALJ recommended that the Commission retain the April price estimates. Although Haynes gave the same testimony in WTU's case, in that case, the ALJ sided with Cities' arguments that the July updates were more accurate. The Commission, in reviewing the ALJ's recommendations, decided to retain the April estimates for both cases. It was not persuaded that adjusting either estimate using more recent July prices would result in a more accurate or reasonable estimate of purchased power for the 2002 rate year because purchased power prices always fluctuate and because the appellants had failed to show a causal connection between the price of natural gas and the cost of purchased power. The purchased power contracts in WTU's and CPL's cases were based on existing contracts which were not tied to the market price of natural gas. Thus, the Commission had a reasonable basis for determining that a change in the price of natural gas would not necessarily alter purchased power costs estimates. Because Steering Committee and Cities have not shown the finding to be unreasonable or unsupported by substantial evidence, we overrule their third issues.

*Railcar depreciation costs*

CPL included approximately $1.572 million in coal fuel expenses for depreciation of aluminum rail cars. Steering Committee argues that, without a depreciation rate study, the

16

evidence is insufficient to show that the rate the Commission included was reasonable. OPC joins in arguing that railcar depreciation expenses are more accurately categorized as a base rate expense and cannot be included in the fuel factor. The Commission noted that in some instances railcar depreciation was treated as a base-rate expense and in others as a fuel-factor expense. It also noted, however, that the railcar depreciation expense had not been included in CPL's base rate and was an actual, fuel-related expense, and heard evidence and argument that depreciation was a proper, eligible fuel expense specifically listed in Federal Energy Regulatory Commission account 501. *See* 16 Tex. Admin. Code § 25.236(a) (including in eligible fuel expenses those properly recorded in FERC account 501, regarding depreciation on fuel transportation equipment). We therefore affirm the district court's holding that the Commission properly included this rate in the fuel factor and overrule the remainder of OPC's first issue in both cases.

Steering Committee also argues that the amount of expenses was unreasonable and unsupported by evidence in the record. We disagree. CPL presented testimony from Randall Hamlett, Manager of Registered Accounting Support for a subsidiary of WTU's and CPL's parent company, and exhibits supporting the reasonableness of the expense, which was not disputed before the Commission. We conclude that there was substantial evidence to support the Commission's ruling regarding the amount of the railcar depreciation expense and overrule Steering Committee's seventh issue.

*Capacity auction expense*

The trial court determined that the Commission's allowing CPL and WTU to account for expenses incurred in replacing the loss of 15% of generating capacity while maintaining 100%

17

customer loads was not supported by substantial evidence and that, in making that finding, the Commission improperly shifted the burden of proof from the utility. The Commission, WTU, CPL, and Constellation appeal these rulings.

They argue that their opponents failed to overcome the presumption that the Commission's ruling was supported by substantial evidence because reasonable minds could have concluded that the REPs would continue to serve 100% of their native load and because the utilities were required by law to auction 15% of their generating capacity.[20] The Commission points to the testimony of witnesses Mark Gilbert[21] and Myron Adams[22] that the demand for electricity by the native customer load was forecasted to be 100% at the beginning of competition and argues that there was substantial evidence supporting the ruling. We agree. The Commission was free to accept or reject the testimony of the witnesses, and even if the evidence had preponderated against its decision, a reasonable basis exists in the record for the Commission's action. *See City of El Paso*, 883 S.W.2d at 185. Reasonable minds could have come to the Commission's conclusion.

The Commission stated that it would have supported a reasonable reduction in forecasted sales if the record had reflected that such reduction existed or what amount of reduction might occur. The district court held, correctly, that it was WTU's and CPL's burden to prove the

---

[20] "Each electric utility . . . shall sell at auction, at least 60 days before the date set for customer choice to begin, entitlements to at least 15 percent of the electric utility's Texas jurisdictional installed generation capacity. For the purposes of this section, the term 'electric utility' includes any affiliated power generation company that is unbundled from the electric utility . . . ." PURA § 39.153(a).

[21] Mark Gilbert is Manager of Economic Forecasting for a subsidiary of AEP, the parent company of WTU and CPL.

[22] Myron Adams is employed as Director of Integrated Resource Planning by AEP.

costs for purposes of calculating the fuel factor. *See* PURA § 39.003. However, we disagree with the district court that the Commission shifted this burden of proof. Rather, when faced with WTU's and CPL's evidence supporting a 100% customer load and a 15% capacity auction, and no evidence to the contrary, the Commission found the utilities' position more tenable and ruled in their favor. *See Central Power & Light Co. v. Public Util. Comm'n*, 36 S.W.3d 547, 561 (Tex. App.—Austin 2000, pet. denied) (Commission had discretion to determine factual issues based upon evidence before it).

We hold that the Commission's decision was supported by substantial evidence and that it did not shift the burden of proof and sustain the Commission's first and second issues in both cases, Constellation's first and second issue, and WTU's and CPL's first issues.

*Unaccounted for energy (UFE)*

Unaccounted for energy, the difference between metered generation and metered customer load (consumption) on the ERCOT system, is determined by ERCOT on a system-wide basis and allocated to REPs based on their share of total ERCOT sales.[23] The Commission included a uniform, system-wide 1% UFE expense allowance in determining WTU's fuel factor, although WTU had not requested that it do so. The district court reversed the Commission's findings regarding WTU's UFE expenses for lack of substantial evidence because the Commission relied on evidence outside the record to set UFE at 1%.[24] WTU appeals, arguing that (1) although it did not

---

[23] WTU and CPL point out that ERCOT costs, which applied to electric utilities before competition began, are relevant to the question of the cost of producing power in 2002.

[24] The district court reversed the Commission's findings 43A, 43B, and 43C. They read as follows:

19

request UFE expenses in its initial case, there is nonetheless substantial evidence, in the form of ERCOT protocols and procedures, and testimony by WTU witness Randall Hamlett, Manager of Registered Accounting Support for a subsidiary of WTU's and CPL's parent company, regarding UFE, and (2) WTU need not individually present evidence of UFE levels because the Commission correctly applied its own precedent or *ad hoc* policy determinations in reaching its decision.

Upon review, we find that there is not substantial evidence supporting the Commission's decision to allow a 1% cost calculation for UFE in this case. It is true that the ERCOT protocols and Hamlett's testimony establish that UFE is an expense charged system-wide on a prorated basis to all ERCOT users. However, we find no evidence in this proceeding regarding the proper amount of UFE allowance; no UFE estimate was offered. Thus, the Commission's inclusion of 1% and not some other amount was based upon decisions and evidence in other cases.

43A. Because UFE costs are actual costs that, under the new ERCOT protocols, will be allocated to all REPs, it is reasonable to include UFE costs in WTU's calculation of eligible fuel expenses.

43B. The appropriate level for UFE costs across ERCOT is 1% of kilowatt-hour (kWh) sales, which represents a lower end of the presented range in the various PTB cases. For policy reasons, it is appropriate to include the same level of UFE in the PTB fuel factors of all affiliated REPs within ERCOT.

43C. It is reasonable for WTU to include UFE costs in the amount of one percent of its kWh sales in its eligible fuel expense.

Because the district court appears to have affirmed the Commission's determination that UFE costs are an eligible expense by allowing UFE expenses in CPL's case, we read its rejection of finding 43A as a holding that inclusion of UFE costs in WTU's case was not reasonable because it was not based upon substantial evidence. We address this point in this section. To the extent that the district court's reversal of 43A could be read as a determination that UFE is not an eligible expense, we would reverse that determination based upon the eligibility discussion above.

20

We must therefore determine whether this qualifies as a correct application of Commission precedent or *ad hoc* policy making.

The Commission has determined that, "for policy reasons, it is appropriate to include the same level of UFE in the PTB fuel factors of all affiliated REPs in ERCOT" because UFE is a uniform cost. WTU argues that, in adopting the uniform 1% UFE cost in this case, the Commission was merely following its own precedent. *See Flores v. Employees Ret. Sys. of Tex.*, 74 S.W.3d 532, 544-45 (Tex. App.—Austin 2002, pet. denied) (agency should follow its own precedent or explain departure from it). However, given that no UFE assessment was ever raised or requested in this case, and that the Commission cited to no prior rulings in support of its 1% determination, we are not persuaded that the Commission intended to apply its reasoning or ruling from former cases containing evidence supporting UFE estimates. We are unconvinced that the Commission included the 1% in order to follow established precedent.

WTU next argues that the Commission's policy of including a uniform 1% UFE estimate in every ERCOT REP's case was effectuated by *ad hoc* rulemaking in a prior proceeding. In some circumstances, the Commission implements its policy choices through *ad hoc* rulemaking, statements interpreting, implementing, or prescribing agency law or policy. *Texas Ass'n of Long Distance Tel. Cos. v. Public Util. Comm'n*, 798 S.W.2d 875, 886 (Tex. App.—Austin 1990, writ denied) ("*TEXALTEL*"); *City of El Paso*, 883 S.W.2d at 188-89 (*ad hoc* adjudication preferred where agency does not have sufficient experience to warrant rigid rule or where problem is too specialized for general rule treatment). Because the uniform percentage was a legislative fact or policy established in a prior proceeding, WTU contends, there is no need for record evidence in this

case because *ad hoc* rules implementing policy need not be supported by a record containing direct evidence regarding their accuracy. *See TEXALTEL*, 798 S.W.2d at 887 (permitting Commission to set ceiling at 145% increase in rates to prevent "severe customer impact" without evidence that 145% of current rates would not cause said impact). The nature of the decision in question belies this claim; the Commission nowhere indicated that it had set a rule in another case governing the disposition in WTU's case, nor did it cite to a previous proceeding for authority supporting its decision. Rather, Commission findings of fact 43B and 43C, although they mention policy while asserting that 1% is the appropriate and a reasonable level for UFE, do not refer to an *ad hoc* rule from any other particular case.

Instead, they appear to apply evidence from other dockets, arguing that "[1%] represents a lower end of the presented range in the various PTB cases" without citing any support from WTU's case. WTU now argues that the Commission may apply relevant evidence from the other cases to this proceeding, citing *West Tex. Utils. Co. v. Office of Pub. Util. Counsel*, 896 S.W.2d 261 (Tex. App.—Austin 1995, no writ) ("*West Tex. Utils.*"), in which, it argues, the Commission applied depreciation rates established in a prior proceeding, rejecting a proposal to change those rates. *Id*. at 267. In *West Tex. Utils.*, the Commission's final order set certain depreciation rates and left others, set by a prior proceeding involving the same utility unchanged; it did not apply evidence from another case to support a finding in the case before it. *Id*. at 269 ("all parties . . . were bound by the Commission's prior decision . . . absent a showing of changed conditions that would necessitate an adjustment"), 270 ("In the present case, the Commission did not rely on findings of fact from a previous case to support a new order concerning depreciation rates. The Commission

22

merely declined to adjust depreciation rates established in a prior final order."). *West Tex. Utils.* is wholly inapplicable here, where WTU urges that the Commission may use facts found in earlier proceedings involving different parties to support findings in later proceedings.[25]

Because there is not substantial evidence supporting this inclusion in this case and because the Commission was not engaged in *ad hoc* rulemaking, but merely applied evidence from other dockets and cases, we overrule WTU's second issue.

Steering Committee also raises a UFE issue on appeal: it argues that the district court erred in affirming the Commission's grant of UFE costs to CPL because there was not substantial evidence supporting that decision in CPL's case. The record reveals that witness John Gillespie testified before SOAH in CPL's case, recommending a positive UFE level be set for CPL and estimating that it fall between 2.2% and 4%, and explaining the basis of his estimates by illustrating

---

[25] We note that an agency may take official notice of generally recognized facts within its area of specialized knowledge, even if they are not judicially cognizable. Tex. Gov't Code Ann. § 2001.090 (a) (West 2000). In this case, though, there is no indication that the Commission took official notice. Also,

> [a]n agency's power to take official notice of a matter within its specialized knowledge is always subject to the proviso that the parties must be given adequate advance notice of the facts which the agency proposes to notice, and given adequate opportunity to show the inaccuracy of the facts or the fallacy of the conclusions which the agency proposes tentatively to accept without proof. To satisfy this requirement, it is necessary that a statement of the matters noticed be incorporated into the record. The source material upon which the agency relies should, on request, be made available to the parties for their examination.

*Railroad Comm'n of Tex. v. Lone Star Gas Co.,* 611 S.W.2d 911, 913-14 (Tex. App.—Austin 1981, writ ref'd n.r.e.) (applying predecessor to government code section 2001.090). No such notice was provided here.

similarities between the California and Texas markets and the effects of competition. The Commission used all this information to decide to include a UFE level of 1%. This evidence on projected UFE was not lifted by the Commission on its own motion from another case, and the fact that the Gillespie's expert opinion was based on the experiences of other utilities has no effect on its validity, absent a showing that the comparisons were unhelpful. Thus, there was substantial evidence supporting the Commission's ruling. We overrule Steering Committee's fifth issue.

## Procedural challenges

OPC, Steering Committee, and Cities accuse the Commission of violating their due process rights to a fair and impartial hearing. In one issue with three subparts, Steering Committee and Cities each argue that Commission Chairman Max Yzaguirre and Commissioner Brett Perlman should have recused themselves from consideration of both CPL's and WTU's applications because both maintained ties with Enron, parent company of intervenor New Power, during the application and review process. Second, Steering Committee, Cities and OPC contend that the Commission denied them an opportunity to present evidence concerning CPL's and WTU's natural-gas-price updates and that the Commission treated them differently than other similarly situated ratepayers. Third, Steering Committee and Cities contend that they were denied due process when the Commission discussed "headroom" issues with witnesses not associated with either CPL's or WTU's proceeding.

The appellants bore the burden of proof at trial to establish the procedural irregularities they allege. *Hammack*, 131 S.W.3d at 729. Here they bear the burden of

24

demonstrating that the trial court's failure to find the alleged irregularities was against the great weight and preponderance of the evidence. *Id*.

**Recusal**

Cities and Steering Committee accuse Yzaguirre and Perlman of having a conflict of interest based on their ties to Enron and that they should have recused themselves.[26] Steering Committee and Cities argue that Yzaguirre's and Perlman's continued ties to Enron and Yzaguirre's failure to fully disclose his employment history with Enron created an impermissible conflict of interest. *See Lewis v. Guaranty Fed. Sav. & Loan Ass'n*, 483 S.W.2d 837, 843 (Tex. App.—Austin 1972, writ ref'd n.r.e.) (commissioners should avoid "any conduct tending to undermine faith and confidence in the man or the office in which he acts").[27]

In support of their argument, Cities and Steering Committee cite to the following: (1) the failure of Yzaguirre to fully disclose his employment interest with Enron;[28] (2) meetings and

---

[26] Cities argue that the Commissioners' previous business relationships with Enron, continuous statements and focus on headroom or REP profit, request and receipt of evidence outside the record concerning headroom, "several outlandish decisions contrary to the interest of ratepayers and financially beneficial to New Power," and Yzaguirre's resignation from the Commission under pressure due to his previous relationship with Enron undermined confidence that the Commission performed its duties in a fair, unbiased manner.

[27] For example, in *Lewis*, we held that it was a denial of due process for the Savings and Loan Commissioner conducting an *ex parte* investigation to consider evidentiary matters outside the administrative record, likening his duty to that of a judge "charged with the solemn trust to act fairly and impartially in fulfilling invested duties." *Lewis v. Guaranty Fed. Sav. & Loan Ass'n*, 483 S.W.2d 837, 843 (Tex. App.—Austin 1972, writ ref'd n.r.e.).

[28] According to Cities and Steering Committee, Yzaguirre failed to publicly disclose his employment history with Enron pursuant to government code section 572.058. *See* Tex. Gov't Code Ann. § 572.058 (West 1994) (requiring Commissioners to publically disclose "a personal or private interest in a measure, proposal, or decision pending before" the Commission). Although Yzaguirre

telephone conversations between New Power employees and Yzaguirre and Perlman occurring during the pendency of the cases, which related to ERCOT issues, deregulation, and market and competition issues; (3) invitations to various social events given to the commissioners from New Power; (4) records of New Power's financial status that were given to the commissioners; and (5) comments Yzaguirre gave to New Power regarding its advertising campaign. Further, Cities and Steering Committee point to New Power's offer to enroll Perlman in a new energy management program. The program was free for the first 500 participants and included free software. Perlman was also given the option of signing up for the program directly without having to go through a call center.

PURA disqualifies directors, employees, controllers, owners, investors, or interested parties of utility companies from holding a commission unless they notify the attorney general and divest themselves of the interest. PURA § 12.152 (West Supp. 2004-05). Commissioners must be recused if their impartiality is "reasonably questioned." *See* 16 Tex. Admin. Code § 22.3(d) 2005).[29] The Commission's recusal rule is similar to Texas Rule of Civil Procedure 18b, which states that "a judge shall recuse himself in any proceeding in which: (a) his impartiality might reasonably be questioned." Under rule 18b, "[r]ecusal is appropriate if the movant has provided enough facts to establish that a reasonable person, knowing all the circumstances involved, would harbor doubts as to the impartiality of the trial court, but only when the bias is of such a nature and extent as to deny

revealed his previous employment by Enron de Mexico, they contend that he should have also disclosed his employment history with Enron North America Corp. during the application process.

[29] A commissioner shall recuse himself if the "commissioner in fact lacks impartiality or the commissioner's impartiality has been reasonably questioned," or if he or a relative has an interest in or has participated in the matter in question. 16 Tex. Admin. Code § 22.3(d).

the movant due process of law." *Rosas v. State*, 76 S.W.3d 771, 774 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (citing *Kemp v. State*, 846 S.W.2d 289, 306 (Tex. Crim. App. 1992)).

Due process at a minimum requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). In administrative proceedings, due process requires that parties be accorded a full and fair hearing on disputed fact issues. *City of Corpus Christi*, 51 S.W.3d at 262; *see also* Tex. Gov't Code Ann. §§ 2001.051-.121 (West 2000); 16 Tex. Admin. Code §§ 22.202-.228 (2005). We presume that decision makers are fair and unbiased. *Hammack*, 131 S.W.3d at 731. A decisionmaker exhibits impermissible bias when "[t]he bias . . . come[s] from an extrajudicial source and result[s] in an opinion on the merits of the case other than what the judge learned from participating in the case." *Rosas*, 76 S.W.3d at 774.

That the Commissioners had contact with the utilities they regulate is relevant upon a showing by appellants that the contacts were of such a nature that they would reasonably call the Commissioners' impartiality into question, but only when the bias is demonstrated to be of such a nature and extent as to deny due process of law. *See Rosas*, 76 S.W.3d at 774 (citing *Kemp*, 846 S.W.2d at 305) (applying identical language from Tex. R. Civ. P. 18(b)); *see also* Charles H. Koch, Jr., *Administrative Law and Practice* § 6.10 (2d ed. 1987) (past business association would not support allegation of conflict of interest and mere allegation will not overcome presumption of honesty and integrity in administrative adjudicators). Although the actions of commissioners Perlman and Yzaguirre might cast doubt on their impartiality, appellants must also demonstrate that the alleged bias denied them due process, which they have not done. Steering Committee and Cities

27

fail to produce the extrajudicial facts they claim played a role in the Commission's final decision. They also fail to allege that Yzaguirre or Perlman had any personal or private interest in either CPL's or WTU's applications. In addition, they do not explain how the allegedly inappropriate contacts prejudiced the Commission in favor of CPL or WTU.

Accordingly, we hold that Steering Committee's and Cities' allegations that the Commissioners met with and maintained social contacts with people affiliated with Enron are insufficient, without more, to demonstrate that Yzaguirre and Perlman were impermissibly impartial. Thus, we overrule Steering Committee's and Cities' first issues.

**The natural-gas-price update**

OPC, Steering Committee, and Cities argue that the Commission erred by not allowing them to present evidence at CPL's and WTU's natural-gas-price true-up proceeding on October 1, 2001, when other, similarly situated, ratepayers were allowed to introduce evidence at other proceedings.[30] Because the price of natural gas could affect purchased power costs as well, in October Steering Committee and Cities reasserted their arguments that CPL's and WTU's purchased power estimates were too high because they failed to reflect the decline in the price of natural gas. CPL and WTU argued that the price of purchased power was not relevant in a proceeding updating natural gas prices.

---

[30] A "true-up" proceeding reconciles estimated costs with actual costs. *See State v. Public Util. Comm'n of Tex.*, 131 S.W.3d 314, 326 (Tex. App.—Austin 2004, pet. denied). This natural-gas-price true-up was to reconcile CPL's and WTU's previous estimates with more recent data: the average price of natural gas over a ten-day period ending September 15, 2001. *See* Tex. Admin. Code § 25.41(f)(3)(D)(I) (2005).

28

Pursuant to an agreement of the parties, the ALJ in each proceeding referred the natural gas price update to the Commission for consideration.[31] Although neither ALJ made formal recommendations, each opined that the October natural gas price update was intended to reconcile CPL's and WTU's natural-gas allowances, not to adjust for purchased power costs. They also commented that Steering Committee and the Cities had failed to prove a relationship between the price of natural gas and the price of purchased power.[32]

OPC, Steering Committee, and Cities requested a hearing on the natural gas price update in both proceedings and filed affidavits claiming that both CPL's and WTU's purchased-power expense estimates were inflated because they did not reflect the substantial decrease in the price of natural gas that occurred in mid July, and that they had not had an opportunity to fully litigate the natural gas price issues because information relevant to the update had not been available prior to October. It was "understood at the beginning of the fuel factor case," OPC contended, that the October update filings and proceedings would be separate from the June and July fuel factor application filings and determinations. The Commission staff filed motions to strike the affidavits,

---

[31] Both natural-gas price proceedings were consolidated in a contested-case hearing unconnected with other proceedings and designated docket number 24460.

[32] The ALJ in WTU's case said:

[T]he PTB rule does not accommodate an October update to power costs. . . . The PTB rule singles out natural gas costs for an October update, but specifically provides that all other inputs into the calculation of the fuel factors will be based on the record developed in this proceeding. . . . The ALJ is unsatisfied that Cities have established a consistent connection between natural gas prices and purchased power.

The ALJ in CPL's case noted that CPL presented "convincing evidence that while power prices can move with gas prices, there is not a consistent relationship between them."

29

arguing that OPC, Steering Committee, and Cities were attempting to relitigate the purchased-power issue and that there was no direct correlation between the prices of natural gas and purchased power.

At the November 7, 2001 hearing on the natural gas price updates, the Commission excluded Steering Committee, Cities, and OPC affidavits attempting to link the prices of natural gas and purchased power. Nevertheless, in its final orders, the Commission concluded that it was proper to adjust an electric utility's purchased-power costs at a true-up proceeding to the extent those costs could be directly indexed to the price of natural gas and adjusted CPL's fuel factor accordingly.[33]

OPC argues here that the Commission abused its discretion in excluding the evidence on the relationship between the prices of natural gas and purchased power because the scope of the inquiry in the true-up proceeding required the Commission to examine all market factors that could impact the price of natural gas, not just the market price of natural gas. It also argues that the exclusion of its evidence shifted the burden of proof from the utilities to the parties in opposition. OPC, Steering Committee and Cities all claim that the Commission impermissibly treated them differently than other ratepayers. *See* PURA § 36.003(b) (West 1998) (prohibiting "unreasonably preferential, prejudicial, or discriminatory" rates).

---

[33] In findings of fact 51A and 51B in CPL's order, the Commission approved a purchased-power adjustment because CPL had one purchased-power contract that was specifically indexed to the price of natural gas. In findings of fact 24C and 24D in WTU's order, the Commission noted that no adjustment was warranted because none of WTU's contracts were indexed to the price of natural gas.

*Purchased power*

OPC argues that, in excluding its evidence and denying a hearing, the Commission abused its discretion and denied ratepayers due process.

In administrative proceedings, due process requires that parties be accorded a full and fair hearing on disputed fact issues. *City of Corpus Christi*, 51 S.W.3d at 262; *Hammack*, 131 S.W.3d at 731; *see also* Tex. Gov't Code Ann. §§ 2001.051-.121; 16 Tex. Admin. Code §§ 22.202-.228. At a minimum, it requires that the "rudiments of fair play" be observed. *Hammack*, 131 S.W.3d at 731 (quoting *State v. Crank*, 666 S.W.2d 91, 94 (Tex. 1984)). This is not to say that administrative hearings must measure up to judicial standards, but even they cannot be arbitrary or inherently unfair. *City of Corpus Christi*, 51 S.W.3d at 262 (citing *Bexar County Sheriff's Civil Serv. Comm'n v. Davis*, 802 S.W.2d 659, 664 (Tex.1990)). Procedural irregularities do not warrant reversal absent a showing of harm. *City of Corpus Christi*, 51 S.W.3d at 262, 264 (Commission's "failure to follow procedural requirements of statutes or rules is not reversible error without a showing of harm"). In order to show harm and obtain a reversal on the grounds that the Commission wrongly excluded evidence requires a showing that the evidence is controlling on a material issue, not merely cumulative. *See Railroad Comm'n of Tex. v. Rio Grande Valley Gas Co.*, 683 S.W.2d 783, 789 (Tex. App.—Austin 1984, no writ) (citing *Lewis v. Metropolitan Sav. & Loan Ass'n*, 550 S.W.2d 11, 14 (Tex. 1977)).

After reviewing the record and OPC's arguments, we conclude that the OPC has failed to show that it was harmed by the denial of a hearing or exclusion of evidence. It is undisputed that the Commission considered the relationship between the market price of natural gas and its effect, if any, on purchased power costs and agreed with OPC's position that the price of natural gas could

31

affect the price of purchased power. The Commission, however, did not agree that the market price of natural gas had a direct effect on CPL's and WTU's contract prices for natural gas. It found, with one exception, that the market price for natural gas would not directly affect CPL's and WTU's natural gas prices because those prices were set by contract and not specifically indexed to the market price of natural gas. Thus, the prices others paid for natural gas were not controlling on the issue of CPL's and WTU's actual contractual gas prices.

While OPC argues that its October update testimony was relevant to the proper updated price of natural gas in that it would show that CPL and WTU had failed to lower their purchased-power costs in light of the changes in the price of natural gas, we note that Steering Committee and Cities presented evidence that CPL's and WTU's natural gas cost projections were too high because they failed to account for decreases in the price of natural gas. OPC has failed to specify what, if anything, the offered testimony would have added that was materially different from the admitted evidence. Because OPC has not shown that the evidence was material and not cumulative, we hold that it was not reasonably calculated to cause the rendition of an improper order. *Rio Grande Valley Gas Co.*, 683 S.W.2d at 789. Absent this showing of harm, any procedural irregularities do not warrant reversal. *City of Corpus Christi*, 51 S.W.3d at 264.

OPC also argues that the exclusion of evidence shifted the burden from the utilities to the parties in opposition. While there is no doubt that the burden of proof lies with the utilities, *see* PURA section 39.003 (West Supp. 2004), the exclusion of evidence did not change the burden of proof to the objecting parties. Both CPL and WTU were required to and did present evidence substantiating their purchased-power expenses. That OPC was prohibited from presenting certain

32

evidence to the contrary does not constitute burden shifting. We hold that OPC was not harmed by the exclusion of its evidence.

*Disparate treatment*

Steering Committee, Cities, and OPC assert that they were treated differently than other similarly situated ratepayers in that the Commission made the purchased-power adjustments based on the market price of natural gas in three other proceedings, TXU's, TNMP's, and Reliant's. *See* PURA § 36.003(b) (prohibiting unreasonably preferential, prejudicial, or discriminatory rates across classes of consumers). We conclude that they have failed to show that they were treated differently than similarly situated ratepayers. First, because Reliant's case and TNMP's case were settled, there could be no comparison between the Commission's actions in those cases and its actions here; the ratepayers in those cases were not "similarly situated," for purposes of applying precedent. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n*, 31 S.W.3d 631, 641 (Tex. App.—Austin 2000) (no precedential value to settled cases), *aff'd*, 92 S.W.3d 434 (Tex. 2002). Second, the Commission's methodology was consistent. The Commission made an adjustment in CPL's case but not in WTU's case because one of CPL's natural gas contracts was "specifically indexed" to the price of natural gas. The Commission similarly permitted an adjustment in TXU's case because it had contract pricing specifically indexed to the price of natural gas.

**Headroom**

Steering Committee and Cities contend that the Commission erred by requesting and receiving evidence outside the record on headroom issues without opportunity for cross examination.

33

"Headroom" refers to the margin between the PTB and the new REPs' costs of providing electricity. *See Reliant Energy v. Pub. Util. Comm'n of Tex.*, 62 S.W.3d 833, 837 n.5 (Tex. App.—Austin 2001, no pet.). This profit margin has a powerful effect on competition; if the PTB includes a great deal of headroom, new market entrants will find it easier to undercut affiliated retail electric providers' prices and still make a profit than if the PTB is closer to the cost of providing electricity.

Steering Committee and Cities argue that an inordinate concern regarding headroom shows that the Commissioners were biased in favor of the utilities. They point to the testimony of Brian Lloyd, a Commission staff member, and Charles Griffey, a witness for Reliant in its previous docket, who participated in an October 18, 2001, open meeting set to discuss CPL's, WTU's, and other utilities' applications to implement their fuel factors. Lloyd and Griffey appeared before the Commission and discussed the creation of a spreadsheet that could be used to examine and compare the different PTB rates established by the Commission, as was done in Reliant's case. In a follow-up memo to the Commission, Lloyd stated that he had created two spreadsheets, which were programmed to show how a change in one particular input, for example, the price of natural gas, would reflect a corresponding effect on the PTB rate.

They also point to Perlman's comments at the December 3, 2001 open meeting in which he said, "I've been deeply disappointed that we're not here having a substantive hearing on whether there is sufficient headroom in the market for new entrants to compete in the marketplace." Commissioner Klein suggested that the Commission solicit feedback from nonaffiliated REPs to see whether they planned to compete:

34

If it turns out that at the end of the day . . . of the 30 or so some odd REPs or whatever the number is in Texas, if some proportion of them say "yes, we will compete in Houston, Dallas and Corpus Christi," then I think we have an answer from the marketplace as a whole and we've received the feedback we need.

Yzaguirre clarified that what the Commission would be asking was not additional cost data but a survey of the REPs to see if they were, in fact, planning to compete against the affiliated REPs. Commission Perlman agreed, "all I'm looking for is a one-page affidavit that says 'I like the rules. I'm going to compete for small residential—for residential customers.'"

Steering Committee and Cities argue that the Commission improperly considered evidence not in the record from the REPs and solicited Lloyd's and Griffey's input on the spreadsheet without providing an opportunity to cross examine either witness.

We believe that Steering Committee and Cities mischaracterize the role the Lloyd follow-up memo played. Commission staff member Lloyd simply created a spreadsheet, possibly based in part on a model provided by Griffey, which allowed the Commissioners the chance to view the different PTB rates and to track effects changes in any given input might have on the PTB rate. Because the memo concerned only the spreadsheet, and Lloyd was a nonparticipating staff member properly working to evaluate evidence, the Commission did not solicit or receive facts not made part of the record or violate the prohibition against *ex parte* communications. *See* Tex. Gov't Code Ann. § 2001.061(c) (West 1998) (*ex parte* communications with Commission employees who have not participated in hearing in case at issue are permitted so agency may use its specialized skill or knowledge in evaluating evidence); *Hammack*, 131 S.W.3d at 732. Although Lloyd did ultimately file testimony and participate in a hearing, we believe that this does not render his memo work

35

suspect, as his testimony was not filed until November. Thus, at the time the Commission communicated with him as its staff member, he had not participated in a hearing.

In addition, Steering Committee and Cities have not demonstrated any harm from the admission of the information. *Cf. Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989). Cities was able to cross-examine Lloyd about the substance of the spreadsheet prior to the issuance of his memo and spreadsheet, and Griffey's comments to the Commission did not mention either CPL or WTU. Similarly, the survey requested by the Commission did not ask for information regarding PTB fuel factors but simply asked REPs to state whether or not they planned to compete in the market. Further, the commissioners stated that they did not consider any response from the REPs as bearing on the contested issues regarding the components of fuel factors.

Second, Steering Committee and Cities do not attempt to show how the Commission's judgment in either CPL's or WTU's case was affected by any *ex parte* communications. *See id.* at 731-32. They must overcome the presumption that the Commissioners were fair, honest, and unbiased. *Id*. at 731. They simply make the tenuous assertion that the Commission was concerned about headroom and was therefore biased. While it does appear that the Commission was concerned that there be enough headroom, it does not necessarily follow that such a concern demonstrates bias, or that an increase in headroom would be in the utilities' long-term interests. The Commission is charged with balancing PURA's competing policy considerations, including electric consumers' interest in lowering costs and new market entrants' interest in establishing competition. *See Reliant Energy*, 62 S.W.3d at 838. That the Commission struck that balance other than where Steering Committee and Cities would have preferred is no

36

indication of bias. A higher PTB which included headroom would increase utility profits in the short term but ultimately encourage competition with the utilities, which the Commission is authorized to do. Indeed, we have suggested that, because of its authority to set the initial PTB, the "Commission *could* ensure initial adequate headroom" if it so chose. *Reliant Energy*, 62 S.W.3d at 838.

We hold that the spreadsheet, memo, testimony, and responses to the Commission's inquiry regarding REPs' plans to compete did not constitute impermissible extra-record evidence and hold that the Commission was within its authority to consider concerns regarding the PTB's effects on competition.

Because there was no harmful exclusion of evidence and because the ratepayers were not treated differently from similarly situated persons, and because the appellants failed to overcome the presumption of impartiality or show harm resulting from any procedural error, we overrule OPC's second issue in WTU's and CPL's case and Cities' and Steering Committee's first and fifth issues and Steering Committee's sixth issue.

**CONCLUSION**

We hold that the Commission properly included the challenged expenses in determining the fuel factors for CPL and WTU; that the Commission's estimates of the amounts of the challenged costs, with the exception of its ruling allowing WTU's UFE allocation, were supported by substantial evidence; and that OPC, Steering Committee, and Cities failed to show any harmful procedural error. We overrule all of OPC's, Steering Committee's, and Cities' issues and

WTU's second issue. WTU's first issue, the Commission's and Constellation's first and second issues, and CPL's first issue are sustained.

We reverse that part of the judgments of the district court concluding that finding 17A in each case was not supported by substantial evidence and that the Commission improperly shifted the burden of proof. We render judgment reinstating finding 17A in each case. We affirm the district court's judgments in all other respects. Accordingly, pursuant to the district court's judgment, WTU's case is remanded to the Commission for further proceedings relating to findings 43A, 43B, and 43C concerning the inclusion of UFE costs.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed in Part; Reversed and Rendered in Part

Filed: February 10, 2006